**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ronald S. SULLIVAN,**
**Defendant–Appellant.**

**No. 89–2233.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 15, 1989.

Decided Aug. 28, 1990.

**4**

Andrew B. Baker, Jr., Asst. U.S. Atty., Office of the U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Gary S. Germann and Clark W. Holesinger, Portage, Ind., for defendant-appellant.

Before CUDAHY, EASTERBROOK and KANNE, Circuit Judges.

KANNE, Circuit Judge.

An eleven-count indictment was returned against Ronald S. Sullivan and two others charging them with crimes relating to the operation of a municipal government agency which administered a job-training program. The seven counts against Sullivan charged him with racketeering, conspiring to engage in racketeering activity, four counts of bribery, and conspiring to defraud the United States. A jury convicted him on all counts. Sullivan appeals his convictions. We affirm.

## I. FACTUAL BACKGROUND

Sullivan was placed in charge of a program which had the worthy goal of providing training and employment to disadvantaged and unemployed individuals in Gary, Indiana. Unfortunately, Sullivan's personal goals were not as worthy. The Gary Manpower Administration ("GMA") was organized in 1974 as an agency of the City of Gary to administer the (now-repealed) federal Comprehensive Employment and Training Act ("CETA"). GMA disbursed CETA funds to contractors who provided job-training programs. Sullivan was the administrator of GMA from 1974 until 1983 when the agency began phasing out.

Several steps to ensure that CETA funds were properly disbursed to quality contractors were supposed to be employed by GMA. The solicitation of bids for contracts was to be well publicized. Contracts were to be awarded after bids were evaluated by several committees and individuals. The performance of contracts was to be monitored by an independent monitoring unit. However, Sullivan and others in GMA were able to subvert these accountability procedures and control the disbursement of the CETA funds. The solicitation of bids was not publicized. The awarding of contracts was essentially at the sole discretion of Sullivan. The monitoring process was also undermined. For example, the head of the monitoring unit in the late 1970's, Shirley Montgomery, complained to Sullivan about contractors not complying with contract requirements. Sullivan took no action. Montgomery then made the mistake of complaining to Sullivan about the absenteeism of a GMA employee, Sheila Quarles. Soon thereafter, Sullivan transferred Montgomery and placed Quarles in charge of the monitoring unit. Not coincidentally, Quarles was Sullivan's girlfriend.

In 1979, Leonard Perkins and Carl Deloney formed a business partnership known as Plus, Ltd. After its formation, Plus was awarded a contract for a CETA training program. Before the first payment under the contract was made, Carl Deloney advised Perkins that there was a "cost of doing business in Gary." Carl Deloney told him that to do business in Gary money had to be paid to Sullivan. Perkins complied. He gave kickback money to Carl Deloney who then gave it to Sullivan.

Subsequently, more kickbacks were made to Sullivan in exchange for the awarding of contracts to Plus. Perkins

began recording the payments, with certain codes, on checkbook stubs. In addition to having Carl Deloney deliver the kickbacks, Perkins delivered some payments to Sullivan personally. Perkins later learned that a Joe Cain also had to be paid. Cain was the director of operations of GMA and second in command to Sullivan. Perkins quit making the payments in 1981. After he stopped paying the kickbacks Perkins continued to submit bids but was not awarded any more contracts.

After his association with Perkins ended, Carl Deloney formed a company called VO-TEC to carry out training contracts with GMA. When Carl died in 1982, his wife Bernice Deloney took over VOTEC. Just before he left GMA in September, 1981, Cain helped form and finance a company called DECAR.

In the fall of 1982, Sullivan and others began exploring the possibility of leasing the Visions Lounge and Gazebo Restaurant in the Sheraton Hotel in downtown Gary. Sullivan, Cain, Deloney and others met on two occasions and a new corporation called DVR was formed to lease the operation of the lounge and restaurant. To satisfy state liquor license requirements, the ownership of the corporation was publicly represented to be 60% owned by Cain through DECAR and 40% by Deloney through VO-TEC. However, there was evidence showing that the actual ownership of DVR was one-third each by Sullivan, Deloney and Cain.

VOTEC and DECAR were awarded large contracts and increases by Sullivan while GMA was being phased out in 1982. The claims for payment submitted by VOTEC showed that many of its trainees were placed at either VOTEC, DVR or the Gazebo Restaurant. Indeed, some of these people testified that they either had never worked for these entities or had not been placed in full-time jobs.

In August of 1982, Adlee Hodges, the manager of training programs for GMA, was told by Sullivan that her position was being phased out because of lack of funding. However, Sullivan told her that she could continue working for GMA by becom-

ing a contractor. Although Hodges had no business experience, she formed a job-training company with the help of Fred McKinney, the fiscal officer of GMA. Soon thereafter she submitted a proposal to GMA. Hodges was awarded a contract for $84,-702.00 with the condition that she hire a friend of Sullivan. GMA provided furniture for Hodges's office and also assisted in moving the furniture. Hodges hired Sullivan's friend and her company was subsequently awarded more contracts. Later, Sullivan told Hodges that there was a way for contractors to say "thank you" for contracts. Soon thereafter, Hodges received a call from Sullivan's administrative assistant telling her to pay $2,000.00 to DVR. Hodges delivered a check to GMA for that amount payable to DVR.

During the course of his tenure as head of GMA, Sullivan, accompanied by Fred McKinney, made a trip to Sullivan's bank. Consistent with his "entrepreneurial skills" and in the tradition of other public officials who receive payback for favors bestowed, Sullivan produced a shoebox containing $31,500.00 in cash. Sullivan used these funds to open an account for two of his corporations.

## II. PROCEDURAL BACKGROUND

In 1989, a federal grand jury returned an eleven-count indictment against Sullivan, Cain and Deloney. Count One charged Sullivan and the co-defendants with conducting an enterprise through a pattern of racketeering activities in violation of 18 U.S.C. § 1962(c). The count alleged thirty-three acts of racketeering in violation of 18 U.S.C. § 201(b) and (c). Count Two charged Sullivan and the co-defendants with conspiring to conduct an enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(d). Counts Three, Five, Seven and Nine charged Sullivan with being a public official and soliciting and accepting something of value for himself or another in return for being influenced in the performance of an official duty, in violation of 18 U.S.C. § 201(c). Count Eleven charged Sullivan and the co-defendants

with conspiring to defraud the United States in violation of 18 U.S.C. § 371.

Sullivan entered a plea of not guilty. After a jury trial, Sullivan was found guilty on all counts. He was sentenced to three years of imprisonment on Counts One and Two, and to two years of imprisonment on the remaining counts, with all sentences to run consecutively. In addition, Sullivan was fined a total of $55,000.00.

## III. DISCUSSION

Sullivan raises a variety of issues on appeal but the primary focus is on evidentiary rulings concerning the testimony of two witnesses, Adlee Hodges and Shirley Montgomery.

### A. *Evidentiary Rulings*

Two government witnesses, Hodges and Montgomery, were permitted to testify to certain conversations regarding Sullivan. Sullivan claims that the testimony of Hodges was admitted contrary to the requirements of Federal Rule of Evidence 404(b). Similarly, he claims that the testimony of Montgomery, although initially blocked under 404(b), was ultimately admitted in violation of that rule.

 On review of a decision to admit evidence, we will rarely disturb the district court's exercise of discretion and will reverse only for an abuse of discretion. *United States v. Zapata*, 871 F.2d 616, 621 (7th Cir.1989); *United States v. Beasley*, 809 F.2d 1273 (7th Cir.1987); *United States v. Byrd*, 771 F.2d 215, 219 (7th Cir.1985).

### 1. *Testimony of Adlee Hodges*

 Sullivan claims that the testimony of Hodges concerning the solicitation of a bribe by a Sullivan aide should have been excluded under Rule 404(b).[1] Evidence of other crimes not charged in the indictment may be admitted under Rule 404(b) only if: (1) the evidence is directed toward estab-

lishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) there is sufficient evidence to support a finding by the jury that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *United States v. Monzon*, 869 F.2d 338, 344 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989); *United States v. Manganellis*, 864 F.2d 528, 531–32 (7th Cir. 1988); *Zapata*, 871 F.2d at 620. The rule excludes evidence of "other crimes" to show conformity with character, but permits the admission of such evidence for another purpose such as to show intent or plan.

Adlee Hodges testified that Sullivan told her there were ways for contractors to say "thank you" for being awarded contracts. Soon thereafter, she received a call from Sullivan's administrative assistant—Lisa Chapa. Before allowing the substance of Hodges's conversation with Chapa to be introduced into evidence, the district court evaluated the proffered testimony under the four-part test and found it to be admissible. Hodges then testified that Chapa told her that she was to contribute $2,000.00 to a closeout party for GMA and to make the check payable to DVR. Hodges knew that Sullivan had an ownership interest in DVR, and she delivered the $2,000.00 check to Chapa at GMA.

As the district court determined, the evidence was directed toward establishing the issue of Sullivan's plan or intent to operate GMA through a pattern of bribery and corruption. The evidence was similar to and virtually contemporaneous with the other acts of bribery solicitation by Sullivan. The evidence could support a jury finding that Sullivan committed the act and its probative value was not substantially

---

1. Federal Rule of Evidence 404(b) reads:
 **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It

 may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

outweighed by the danger of unfair prejudice. Thus, we hold that the district court did not abuse its discretion by admitting this evidence.

### 2. *Testimony of Shirley Montgomery*

■ Late in 1981, the Private Industry Council was incorporated. It had independent authority to approve certain kinds of CETA contracts without going through GMA. Shirley Montgomery was the head of the Council.

During its case-in-chief, in the course of the direct examination of Montgomery, but out of the presence of the jury, the government made an offer of proof that she was offered a bribe by Avatus Stone, owner of a company that had contracts with GMA. The government proffered that Stone told Montgomery that he would pay her "enough money to retire" if she would get his contract approved by the Council. Montgomery further indicated in the offer of proof that when she refused, Stone told her "you are certainly stupider than Ron [Sullivan] and Fred McKinney." The court considered the admissibility of this evidence under the Rule 404(b) test. The court determined that the evidence was not sufficient to show Sullivan committed a similar act and it would be unfairly prejudicial to Sullivan to admit the testimony.

After the court initially ruled that the proffered testimony would be inadmissible, counsel for co-defendant Cain informed the court that on cross-examination he intended to elicit from Montgomery the fact that she testified to the grand jury that Stone offered her a bribe. Cain's counsel stated that this questioning would lay a foundation for him to impeach Montgomery by calling Stone as a witness to deny making the bribe. The court informed counsel for the defendants that Cain's cross-examination might "open the door" on this matter and allow the government to pursue the bribe conversation in detail on redirect examination. Significantly, Sullivan raised no objection to the course outlined by co-defendant Cain.

The government then concluded Montgomery's testimony without any mention of the bribe conversation with Stone. The jury was excused for the day. The judge met with the attorneys and Cain's counsel reiterated his intention to ask Montgomery whether she told the grand jury that Stone attempted to bribe her. Again, no objection was raised by Sullivan. The next morning the judge again met with counsel outside the presence of the jury and Cain's counsel repeated his intention to pursue the matter for the purpose of impeachment. The court then ruled: [2]

It is the court's position right now, unless I hear argument otherwise, gentlemen, that I have no choice but to allow [Cain's counsel] to go into it for the purpose [of impeachment]. Are there going to be any objections?

Notwithstanding the court's indication of its position regarding the admissibility of the Stone–Montgomery bribe conversation and call for any objections, Sullivan remained silent. On cross-examination, Cain's counsel, without objection from Sullivan, elicited from Montgomery her statement that Stone offered her a bribe. As expected, on redirect examination the government sought to bring out the rest of the conversation about the bribe.

(Redirect Examination by the government:)

Q What did he say?

A Told me if I would get a contract passed through my Board of Directors that he would give me enough money to retire; I wouldn't ever have to work again.

Q What did you tell him?

A I told him he—there was no way he could do that. You know, I did not—would not take myself and try to present to the board why we should do a contract with him with all of his contracts showed that he did not do what he was supposed to do, having done contracts with Gary Manpower for a long time; that he did not—I

---

2. This procedure utilized by the court for making an advanced ruling on the admissibility of evidence was in accordance with Fed.R.Evid. 103(c).

could not show the council performance where people had gone through his training and had been placed, and I would not subject myself to what I knew I would get from my council.

Q So you said no deal, I won't take it?

A That's right.

Q What did he say to you?

A Told me how dumb and stupid I—

MR. GERMANN (Sullivan's Counsel): Objection.

MR. MILNER (Government Counsel): Excuse me, ma'am.

MR. GERMANN: Objection, Your Honor, two reasons. One, for the reasons that I had indicated earlier yesterday, and secondly, beyond the scope of cross examination of Mr. Jones (Cain's counsel).

THE COURT: With regards to what was mentioned earlier I gave counsel an opportunity to object earlier; they did not. That's overruled and it's overruled insofar as being outside the scope of cross examination. That was gone into.

MR. MILNER:

Q What did—what did Mr. Jones say to you when you told him you didn't want the bribe?

A Mr. Stone.

Q Mr. Stone, I'm sorry?

A Told me how stupid I was, how dumb and stupid I was, and he was certainly glad that Ron and Fred McKinney wasn't dumb as I was.

(Tr. Vol. 5, p. 1018–20.)

The issue presented is whether, by failing to interpose any objection to the cross-examination by Cain's counsel, which "opened the door" for the redirect examination testimony that implied that Stone had bribed Sullivan, Sullivan waived his right to object to the government's follow-up questioning. The court had repeatedly warned counsel for the defendants and finally ruled that the pursuit of Stone's purported bribe of Montgomery on cross-examination would open the door for redirect examination by the government on that issue. Once the subject of the bribe offer was before the jury, the court reasoned that it would be unfair to prohibit the government from exploring the matter further. It was clear to all trial participants, including Sullivan, exactly what additional testimony would be given by Montgomery on redirect examination.

Although it was Sullivan's co-defendant Cain who elicited the response from Montgomery which "opened the door" for the government, Sullivan acquiesced in Cain's cross-examination and thus waived his right to prohibit the government's exploration of the matter on redirect examination. Sullivan could not sit back, let the "door opening" evidence come in unchallenged during cross-examination, and then assert that the government's redirect examination on that issue provided testimony which was unfairly prejudicial under Rule 404(b). The response was not beyond the scope of the cross-examination. The district court did not abuse its discretion in overruling Sullivan's objection and allowing the government to pursue the full conversation between Montgomery and Stone on redirect examination.

█ Even if this were not the case, any error in the admission of this brief statement would have been harmless. The *only* testimony the government elicited in this area dealing with Sullivan was that single answer to the question of Stone's response when Montgomery refused the bribe: "Mr. Stone ... told me how stupid I was, how dumb and stupid I was, and he was certainly glad that Ron and Fred McKinney wasn't dumb as I was." The adverse effect of Montgomery's testimony on Sullivan was slight given the single response which merely cast an inference of wrongdoing compared to the substantial amount of other evidence introduced against Sullivan. In addition, Sullivan was actually aided by Stone's rebuttal testimony which served to offset that of Montgomery. Stone denied having any conversation about bribes with her, denied paying any bribes with regard to GMA, and accused Montgomery of soliciting bribes.

### B. *Sufficiency of the Evidence*

#### 1. *Standard of Review*

An appellant challenging the sufficiency of the evidence to support a jury verdict

bears a "heavy burden" in his attempt to overturn the verdict. *United States v. Nesbitt,* 852 F.2d 1502, 1509 (7th Cir.1988), *cert. denied,* 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989). We review all the evidence and all reasonable inferences drawn therefrom in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Vega,* 860 F.2d 779, 793 (7th Cir.1988). We must uphold a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Grier,* 866 F.2d 908, 922 (7th Cir.1989).

### 2. *The Bribery Counts*

■ Sullivan argues that the evidence was insufficient to support his convictions under 18 U.S.C. § 201(c) [3]—the four bribery counts. These counts related to payments by Cain and Deloney to DVR. Specifically, Sullivan challenges the sufficiency of the evidence on the element of soliciting or receiving something of value. The government introduced evidence to show Sullivan's ownership interest in DVR and his attempts to gain political favor with Gary city officials who wanted to prevent the closing of the downtown Sheraton Hotel. Sullivan received nothing of value, he argues, because he was not an employee of DVR and any political stature or influence which he gained is intangible and cannot be considered as "anything of value" under the statute.

This argument must fail. We need not address the assertion that an intangible, such as the enhancement of political influence or stature, does not qualify as some-

thing of "value" under the statute. Regardless of the claim of intangible benefits, there was sufficient evidence for the jury to find that Sullivan had a very tangible hidden ownership interest in DVR. He received tangible value from the payments made to DVR. For instance, the manager of the Visions Lounge testified that Sullivan acknowledged that he was a one-third owner of the operation. Later, Cain confirmed to the manager that the lounge was owned by Sullivan, Deloney and Cain. Deloney told a tax advisor that Sullivan, Cain and he were each one-third owners of DVR. In addition, Sullivan was one of the signatories on the bank accounts of DVR. The determination that Sullivan had an ownership interest in DVR was one for the jury and there was substantial evidence presented to support that proposition. Because the evidence was sufficient to support the other elements of the bribery counts as well, we affirm the convictions.

### 3. *The Racketeering and Racketeering Conspiracy Counts*

Sullivan was convicted in Count One of conducting an enterprise through a pattern of racketeering activity under 18 U.S.C. § 1962(c) and in Count Two of conspiring to conduct such an enterprise under 18 U.S.C. § 1962(d). He argues that his conviction on Count One should fail because that charge required, pursuant to the jury instruction given, that at least one act of bribery occur after June 22, 1983. This argument, however, is contingent on our finding insufficient evidence to support the four bribery convictions because they were the charged racketeering acts which occurred after June 22, 1983. Sullivan's challenge to Count Two is also contingent on the success of his challenge to the bribery convictions. Because we affirmed the bribery convictions, these arguments are unavailing and the evidence is sufficient to

---

**3.** As applicable to Sullivan, 18 U.S.C. § 201(c) reads:

Whoever, being a public official or person selected to be a public official, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for:

(1) being influenced in his performance of any official act; or

(2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

(3) being induced to do or omit to do any act in violation of his official duty.

support the convictions on Counts One and Two.

### 4. *The Conspiracy to Defraud the United States Count*

■ Count Eleven charged Sullivan, Cain and Deloney with conspiracy to defraud the United States in violation of 18 U.S.C. § 371. The count alleged Sullivan, Cain and Deloney, by agreement, formed DVR and financed it through the use of CETA funds. Sullivan challenges the sufficiency of the evidence to support the verdict because, he argues, the evidence did not show that he knew DECAR and VOTEC were receiving CETA funds to which they were not entitled. However, the evidence of Sullivan's control over the distribution of CETA funds, the dubious placement of trainees by VOTEC and DECAR, the discussions regarding the formation of DVR, the contribution of funds to DVR by VOTEC and DECAR, and Sullivan's relationship with Cain and Deloney combined to provide substantial evidence from which the jury could infer his knowledge and participation in the conspiracy. The money which DECAR and VOTEC funnelled to DVR came from GMA as CETA funds. Thus, there was sufficient evidence to support the verdict.

### C. *Admission of Evidence of Cash in a Shoebox*

■ Sullivan argues that the district court erred by admitting testimony of McKinney that he saw Sullivan take a shoebox containing $31,500 in cash from his office to open two bank accounts for his corporations. The district court admitted the evidence over Sullivan's objection that it was unduly prejudicial under Federal Rule of Evidence 403.

As we previously stated, we give much deference to a district court's determination to admit evidence and will reverse only for abuse of discretion. *Zapata*, 871 F.2d at 621; *United States v. Jackson*, 886 F.2d 838 (7th Cir.1989); *United States v. Allen*, 798 F.2d 985, 1001 (7th Cir.1986). Here, the district judge did not abuse his discretion in balancing the relevancy of the evidence with any danger of unfair prejudice. Much of the evidence against Sullivan was to establish that Perkins paid substantial bribes to Sullivan, both in person and through Carl Deloney. The evidence which disclosed a large amount of cash maintained in a shoebox was highly probative of the bribe payments, and served to corroborate the testimony of Perkins. Its probative value was not substantially outweighed by the danger of any prejudice to Sullivan.

### IV. CONCLUSION

For the foregoing reasons, the convictions of Ronald Sullivan are

AFFIRMED.