**UNITED STATES of America,**
**Plaintiff–Appellee,**
**Cross–Appellant,**

v.

**Timothy ATTERSON,**
**Defendant–Appellant,**
**Cross–Appellee,**

**Sarah McCoy, Stephen Mike Randall,**
**Juan Manuel Laurelez,**
**Defendants–Appellants.**

**Nos. 89–2157, 89–2158, 89–2159,**
**89–2160 and 89–2256.**

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1990.

Decided Feb. 25, 1991.

---

**7.** For the text of the Bennett Amendment and the pertinent provision of the Equal Pay Act, see n. 3 *supra*.

Frances C. Hulin, Richard N. Cox, Asst. U.S. Attys., Danville, Ill., for U.S.

J. Steven Beckett, Beckett & Crewell, Champaign, Ill., for Timothy C. Atterson and Sarah L. McCoy.

Traci Nally–Harris, Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, Champaign, Ill., for Juan M. Laurelez.

Arthur M. Lerner, Lerner & Kirchner, Champaign, Ill., for Stephen M. Randall.

Before WOOD, Jr., EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Three of the four defendants in these consolidated appeals challenge their drug-related convictions. The fourth defendant, Timothy Atterson, appeals only from his sentence. The government cross-appeals from the district court's refusal to increase Atterson's guideline offense level for possession of a firearm during the commission of a drug offense. As the defendants raise only one common issue on appeal, we will address each defendant's appeal separately prior to addressing the issue raised in the government's cross-appeal.

## 1. FACTUAL BACKGROUND

Timothy Atterson, a resident of Mahomet, Illinois, traveled to and from Tucson,

Arizona ten times between September, 1987 and May, 1988. He typically flew into and out of Lambert Airport, located in St. Louis, Missouri, for those trips. On one occasion, he and his girlfriend, co-defendant Sarah L. McCoy (now Mrs. Atterson), drove to Arizona in late January, 1988, for a two-week period. Law enforcement agents from Illinois, Missouri, and Arizona conducted surveillance in connection with four of Atterson's Arizona trips. This surveillance established the following facts.

On December 18, 1987, Atterson loaded two large blue suitcases into the trunk of his automobile, drove from his home to Lambert Airport, and departed on a flight bound for Tucson. Upon arriving in Tucson, Atterson drove to co-defendant Juan Manuel Laurelez' home. Atterson returned to Lambert Airport on December 21, 1987. A narcotics detection dog reacted to both of Atterson's suitcases in the baggage handling area.

Atterson retrieved the suitcases without incident, loaded them into the trunk of his car, drove the car to Urbana, Illinois, and pulled up to a shed rented by co-defendant Stephen Mike Randall. He and Randall chatted briefly outside the shed. Shortly thereafter, Atterson got back into his car and drove off. He returned to the shed later that same evening. At that time, Atterson removed a "pillow-shaped" object from his car and carried the object into the shed. Approximately one hour later, Atterson emerged from the shed carrying a large shopping bag.

On April 5, 1988, agents again observed Atterson as he returned to Lambert Airport on a flight from Tucson. This time he claimed his two large blue suitcases, loaded them into the trunk of his car, and drove from the airport to West Terre Haute, Indiana. At that point, agents lost sight of his car. Several hours later, Atterson was seen driving up to Randall's home and pulling his car into a shed located on Randall's property.[1] Atterson backed his car out of the shed approximately twenty-five min-

utes later and drove home. On April 25, 1990, Atterson was again seen returning to Lambert Airport from Tucson. He was followed from the airport to the Terre Haute, Indiana area where agents once again lost sight of his car.

This familiar sequence of events occurred once more beginning on May 17, 1988. Atterson was seen placing his two blue suitcases in the trunk of his car and leaving his home for the airport whereupon he boarded a flight bound for Tucson. He returned to the airport two days later, on May 19, 1988, retrieved his suitcases, and drove directly to Randall's home. Upon arriving there, Atterson drove his car into Randall's shed. Approximately one hour later, Atterson backed his car out of the shed and drove home.

After Atterson departed, agents executed search warrants at Randall's home and shed. Three large plastic bags, each containing trash compactor bags which in turn contained approximately thirty pounds of marijuana, were seized from the shed. Laurelez' palmprint was lifted from one of the compactor bags. Agents also seized a bag containing a triple-beam balance scale, boxes of clear plastic bags, and twist-ties from the shed. The search of Randall's mobile home led to the seizure of cash totalling $1,050.00 from a bedroom dresser drawer, and an additional $1,910.00 in cash and records pertaining to marijuana sales from a safe found in the bedroom.

Later that same evening, agents executed search warrants at Atterson's home and car. The two large blue suitcases were taken from the trunk of Atterson's car, opened, and found to be virtually empty. Two Western Union receipts, representing cash transfers from Atterson to Laurelez, were also confiscated from the car. The search of Atterson's home, which he had shared with Sarah McCoy since 1981, resulted in the seizure of 894 grams of marijuana, a triple-beam scale, two additional Western Union receipts, ten $100 bills, and a notebook recording drug trans-

---

1. Randall leased the shed that was the focus of the December 21, 1987 surveillance. He continued leasing the shed until the end of January, 1988 at which time he built a shed on his property adjacent to his home.

actions. Agents also found two Western Union receipts, representing cash transfers from McCoy to Laurelez, in McCoy's purse along with an address book containing Laurelez' and Randall's home telephone numbers.

Following a jury trial, each defendant was convicted of conspiracy to distribute in excess of 100 kilograms of marijuana. Stephen Mike Randall was also convicted of possession with intent to distribute marijuana. Sarah McCoy was convicted of possession of marijuana; interstate travel in aid of racketeering; and money laundering. Juan Manual Laurelez was convicted of possession with intent to distribute marijuana and money laundering. Timothy Atterson was convicted of possession with intent to distribute marijuana; interstate travel in aid of racketeering; and money laundering. Each was sentenced under the United States Sentencing Guidelines ("Guidelines").

## 2. ANALYSIS

Before turning to the issues raised separately by each defendant, we address the only common issue presented by these consolidated appeals. Jointly, the defendants challenge the sufficiency of the evidence with respect to the 100 kilograms (220 pounds) of marijuana found to have been involved in the conspiracy. They each concede that a favorable ruling on this issue would impact only on their sentences.

Recent decisions of this circuit clearly hold that the amount of the controlled substance involved in an offense is not an essential element of that offense which the government must prove beyond a reasonable doubt. Rather, the district judge must resolve the quantity issue at sentencing. *See United States v. Reynolds*, 900 F.2d 1000, 1003–04 (7th Cir.1990); *United States v. Ocampo*, 890 F.2d 1363, 1372–73 (7th Cir.1989). The district court's finding as to the amount of the controlled substance involved in the offense is a factual finding invoking a "clear error" standard of review. *Id.* Applying that standard to the facts before us, we find that there is ample evidence in the record to support the district judge's finding that the defendants conspired to distribute over 100 kilograms of marijuana. Indeed, the jury determined that the government, although not required to do so, had established the existence of this quantity beyond a reasonable doubt.

At trial, the government submitted evidence demonstrating that Atterson had travelled to Tucson at least ten times within a nine-month period. Each of those trips, with one exception, were for five-day periods or less. Law enforcement officials set up surveillance in connection with four of those trips. On each occasion, Atterson travelled to and from Arizona with two large suitcases in tow. A narcotics detection trained dog reacted to both suitcases upon Atterson's return from one of these trips. Financial records introduced at trial revealed that Atterson, during the same period of time, spent almost $40,000 more than he could account for. Finally, bank and Western Union records revealed that during the relevant period of time, Atterson and McCoy had transferred funds totalling $64,036 to Laurelez and his wife. That evidence, coupled with the inference that at least thirty pounds of marijuana was involved on each trip, unquestionably supports the district court's finding that the conspiracy involved an intent to distribute in excess of 100 kilograms of marijuana. We thus reject this challenge to the sentences imposed by the district court and turn to the issues raised by each defendant's appeal.

### A. *Stephen Mike Randall*

As noted previously, Stephen Mike Randall was convicted of possession with intent to distribute approximately thirty pounds of marijuana, in violation of 21 U.S.C. § 841(a)(1), in addition to his conspiracy conviction. Randall, however, challenges only the conspiracy conviction, contending that the evidence at trial was insufficient to link him to the conspiracy.

Randall's burden of supporting a challenge directed to the sufficiency of the evidence is formidable as we must affirm so long as "any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt." *United States v. Penson,* 896 F.2d 1087, 1093 (7th Cir.1990). In making this determination, we look to all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the government. We must affirm unless the record is barren of any evidence, regardless of its weight, from which the trier of fact could find guilt beyond a reasonable doubt. *United States v. Nesbitt,* 852 F.2d 1502, 1509 (7th Cir.1988), *cert. denied,* 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989) (citations omitted). To sustain the conspiracy to distribute marijuana charge against Randall, the government need only prove the existence of the conspiracy and a participatory link with Randall. *United States v. Durrive,* 902 F.2d 1221, 1225 (7th Cir. 1990) and cases cited therein.

■ Randall contends that while the evidence clearly demonstrated that he purchased the marijuana Atterson had obtained in Tucson, it failed to establish any intent on his part to join in and further the goals of the conspiracy. *Cf. United States v. Douglas,* 818 F.2d 1317, 1321 (7th Cir. 1987), *cert. denied,* — U.S. ——, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989) and cases cited therein; *United States v. Mancari,* 875 F.2d 103 (7th Cir.1989) (the mere purchasing of drugs or other property from a conspiracy, standing alone, will not establish membership in the conspiracy). In *Douglas,* we reviewed the defendants' challenge to the district court's refusal to give their proffered jury instruction which incorporated their buyer-seller defense to the conspiracy charges they faced. We observed that a defendant is entitled to a buyer-seller instruction only if the instruction has some evidentiary foundation. *Douglas,* 818 F.2d at 1321. Thus we concluded that among the factors we might consider in determining whether a buyer-seller instruction was supported by the evidence were the "quantity of drugs involved, their resale value, and whether the purchases, during the relevant time period at issue, were of the quantity and quality that a jury could reasonably believe are generally used for personal consumption." *Id.*

Applying those factors to the evidence at hand, we find it difficult, if not impossible, to believe Randall's theory that he had purchased the thirty pounds of marijuana from Atterson for his personal "stash." The inference that Randall regularly purchased large quantities of marijuana from Atterson for resale purposes is enhanced considerably by the fact that Atterson visited Randall immediately upon returning from Tucson on at least three separate occasions, two occurring within several weeks of each other. That evidence, coupled with the triple-beam scales and drug sales records confiscated from Randall's shed and home, clearly suggests that Randall was the "warehouseman" for the marijuana. Under these circumstances, we find that the government has sustained its burden of demonstrating Randall's connection to the conspiracy and his conviction must be affirmed.

## B. Sarah L. McCoy (Atterson)

Sarah McCoy also challenges the sufficiency of the evidence to support all but her possession conviction, which was based on the 894 grams of marijuana seized from her home at the time it was searched. Again we begin our review by noting that McCoy faces an uphill battle in supporting her challenge to the sufficiency of the evidence supporting her convictions.

McCoy's challenge is not so much directed at the facts establishing her guilt but rather at how the jury construed those facts in light of the explanations she offered at trial for her conduct. She argues that while she engaged in conduct furthering both the goals of the conspiracy and the other offenses for which she was convicted, she lacked the required mental state to be held accountable for those offenses. We turn first to her challenge to her conspiracy conviction.

■ A person cannot be a co-conspirator unless he or she is aware of the essential nature of the conspiracy. *United States v. Williams,* 737 F.2d 594, 614 (7th Cir.1984), *cert. denied,* 470 U.S. 1003, 105

S.Ct. 1354, 1355, 84 L.Ed.2d 377 (1985). The requisite knowledge may, however, be established by "circumstantial evidence or inferred from basic facts." *Id.; Durrive*, 902 F.2d at 1225. We have emphasized in the past as we do now that a defendant's mere knowledge of, approval of, association with, or presence at a conspiracy standing alone is insufficient to establish membership in the conspiracy. *Id.* at 1225; *United States v. Williams*, 798 F.2d 1024, 1028–29 (7th Cir.1986); *United States v. Quintana*, 508 F.2d 867, 880–81 (7th Cir. 1975).

At trial, the government introduced evidence revealing that McCoy had, on three separate occasions, wired substantial sums of money to Laurelez. The timing of those transfers coincided with the timing of Atterson's Tucson trips. The government also submitted evidence demonstrating that McCoy traveled with Atterson to Tucson in January of 1988. Finally, agents discovered 894 grams of marijuana, triple-beam scales, large quantities of cash, and records revealing drug transactions during the search of the home she had shared with Atterson since 1981.

McCoy testified at trial offering her own innocent explanations for her conduct. In essence, she claimed that due to her financial and emotional dependence on Atterson, she had allowed herself to become his pawn, doing as he bid without questioning his motives. The jury, however, chose not to believe her version of the facts. When the government's case is built largely on circumstantial evidence, as it was in this case, it "need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond reasonable doubt." *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986), *quoting United States v. Thornley*, 707 F.2d 622, 625 (1st Cir.1983). Ultimately, the trier of fact "must be free to choose among various reasonable constructions of the evidence." *Id.* Since we find that the jury's construction of the facts linking McCoy to the conspiracy to be reasonable in light of the evidence at trial, that conviction must be affirmed.

Because we find support in the record for the jury's conclusion that McCoy was aware of and participated in the conspiracy to distribute marijuana, we likewise affirm her Travel Act and money laundering convictions. To prove a violation of the Travel Act, 18 U.S.C. § 1952, the government was required to demonstrate beyond a reasonable doubt that McCoy traveled in interstate commerce with the intent to promote, manage, establish, or carry on the unlawful activity of marijuana trafficking. *United States v. Rollins*, 862 F.2d 1282, 1288 (7th Cir.1988), *cert. denied*, 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989). The government must demonstrate actual interstate travel. *Id.* McCoy argues that the trip she took to Arizona with Atterson in late January of 1988 was for purely recreational purposes. By that time she had, however, wired money to Laurelez. The jury ultimately rejected her characterization of that trip. Since we concluded that the evidence supported the jury's determination that McCoy was aware of and engaged in acts in furtherance of the conspiracy, we conclude that the same rationale applies to her Travel Act challenge.

Likewise, we decline to discredit the jury's finding that McCoy had engaged in money laundering activity. The government was required to prove, beyond a reasonable doubt, that McCoy transferred money to Laurelez with the knowledge that the money represented proceeds from the distribution of marijuana. While McCoy freely admitted to having sent the funds, she testified that she was unaware of where the funds had come from or why Atterson was instructing her to wire the funds to Laurelez. Again, the jury was free to reject the explanations McCoy gave for her conduct. Since it was reasonable for the jury to conclude that McCoy was aware of the conspiracy, it was equally reasonable for the jury to conclude that she was aware of the source of the funds and why she was sending them to Laurelez. Thus McCoy's conviction will be affirmed as to all counts.

## C. *Juan Manuel Laurelez*

Defendant Laurelez launches a series of challenges both to his convictions and to the sentences imposed in conjunction with those convictions. We first address the challenges directed toward his convictions.

Controversy erupted at trial toward the end of the government's case-in-chief over the admissibility of a statement made by Timothy Atterson to an Illinois State Police agent after Atterson had been taken into custody. In his post-indictment statement, Atterson stated that he had made six to eight trips to Tuscon to pick up marijuana and that on each occasion he procured between 10 to 15 pounds of the drug. He also described the amounts he paid for the drug and what prices he commanded upon resale. The government sought to introduce only these portions of the statement and objected to the defendants' collective desire to have the complete statement introduced into evidence. Laurelez in particular sought to preserve his ability to have that portion of the statement, in which Atterson stated that his supplier was a man named "Alex" and that Laurelez was simply a friend, admitted into evidence during his case-in-chief. Ultimately, however, Laurelez agreed with the district court's suggestion that the entire statement was inadmissible under Rule 403 of the Federal Rules of Evidence. Laurelez now challenges that ruling on appeal.

■ Although Laurelez challenges the district court's ruling that the entire statement was inadmissible under Rule 403, the fact remains that he joined the other defendants in agreeing that the entire statement should be excluded under that Rule. Can one be a proponent of a ruling in the district court and then turn around and challenge the propriety of that ruling in this court? We think not. *Cf. United States v. Sullivan*, 911 F.2d 2, 5–6 (7th Cir.1990). We need not explore this anomaly, however, for we agree with the district court's finding that the entire statement, though relevant, was inadmissible because its probative value was substantially outweighed by the danger of jury confusion the statement's admission would have generated.[2]

Laurelez' attorney, during subsequent discussions which ensued over the admissibility of Atterson's statements, also sought to have the entire statement admitted in Laurelez' case-in-chief as a declaration against interest pursuant to Rule 804(b)(3) of the Federal Rules of Evidence. Although the district judge made no specific ruling concerning the statement's admissibility under Rule 804(b)(3), the court's rationale under Rule 403 was controlling.

■ Laurelez moved for a severance immediately after the district judge ruled the entire statement inadmissible under Rule 403. That motion was summarily denied. Laurelez now challenges that ruling, contending that the district court committed reversible error by not allowing him to be tried separately from his co-defendants.

A "motion for severance is directed to the discretion of the district court, and we will reverse a defendant's conviction only upon a showing of clear abuse of that discretion." *United States v. Pavelski*, 789 F.2d 485, 491 (7th Cir.), *cert. denied*, 479 U.S. 917, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986), *quoting United States v. Shue*, 766 F.2d 1122, 1135 (7th Cir.1985); *see also United States v. Buishas*, 791 F.2d 1310, 1315 (7th Cir.1986). Further we note that "in considering a motion for severance, the trial judge should give due deference to the strong public interest in having persons jointly indicted tried together, especially where the evidence against the defendants arose out of the same acts or series of acts." *Pavelski*, 789 F.2d at 491, *quoting United States v. Oxford*, 735 F.2d 276, 280 (7th Cir.1984).

■ A district judge contemplating a defendant's motion seeking severance in order to avail himself of purportedly exculpatory testimony by a co-defendant should consider three factors in ruling on the mo-

---

**2.** The district judge, citing fairness considerations and the "verbal completeness rule," rejected the government's suggestion that only portions of the statement be admitted to avoid introducing collateral issues. Trial Transcript at 531–34.

658

tion: "(1) whether the codefendant's testimony would be exculpatory; (2) whether the co-defendant would in fact testify; and (3) whether the testimony would bear on defendant's case." *Pavelski*, 789 F.2d at 491, *quoting United States v. Melton*, 689 F.2d 679, 686 (7th Cir.1982). Finally, we note that we will reverse a conviction on these grounds "only for the most compelling factual situations." *Pavelski*, 789 F.2d at 491, *quoting Oxford*, 735 F.2d at 280. Thus, a defendant must demonstrate that "he will be unable to obtain a fair trial without severance, not merely that a separate trial would offer him a better chance of acquittal." *United States v. Papia*, 560 F.2d 827, 836 (7th Cir.1977).

Laurelez argues that he had every indication to believe that Timothy Atterson would have testified on his behalf in a separate trial. In support of this argument, Laurelez points to Atterson's willingness to have the statements he made to the agent introduced at trial. Moreover, he argues that even in the event Atterson refused to testify at a separate trial, the statements he made to the agent could be introduced through the agent's testimony at that trial in lieu of Atterson's actual appearance on the witness stand. This brings us back to the question of the statement's admissibility under Rule 804(b)(3), however, something we already have good reason to believe would not have occurred given the lack of corroborating circumstances supporting the statement's reliability. Laurelez fails to carry his burden of persuading us he was denied a fair trial due to his inability to obtain a severance on these grounds.

The other issues Laurelez raises in connection with his convictions merit only brief discussion. Count 2 of the indictment charged each of the defendants with possession with intent to distribute the approximately thirty pounds of marijuana seized from Randall's shed on May 19, 1988. The jury was instructed that the government's theory for holding Laurelez liable under this count was that Laurelez aided and abetted Randall's possession with intent to distribute the marijuana furnished by Atterson. During deliberations, the jury sent a note to the judge stating that: "We do not understand why Laurelez was named in Count II if it only pertains specifically to possession and distribution in the Central District of Illinois." After conferring with counsel, the district judge issued the following to the jury:

Remember, you must consider the court's instructions as a whole not singling one out and disregarding the rest. You should consider what bearing if any, pages 17, 22, and 23 of the instructions have on your question. But again remember that the instructions are to be considered as a whole.

On appeal, Laurelez challenges the district court's response to the jury's statement, claiming on the one hand, that the response was actually non-responsive to the question at hand, *cf. Powell v. United States*, 347 F.2d 156 (9th Cir.1965); *United States v. Harris*, 388 F.2d 373 (7th Cir.1967), and additionally, that the district court's statement in fact operated to highlight jury instructions emphasizing the government's theory of the case.[3] Laurelez suggests

**3.** The first instruction referred to in the court's response stated:

When two or more persons are charged with the commission of a crime, the guilt of one defendant may be established without proof that each of the defendants performed every act constituting the crime charged. However, you must give separate consideration to each individual defendant, and to each separate charge against him or her. Each defendant is entitled to have his or her case determined from his or her own conduct and from the evidence which may be applicable to him or her.

The second instruction defined the terms "actual possession" and "constructive possession" and stated:

It is not necessary that possession be exclusive. Possession may be sole or possession may be joint. If a person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

Mere presence in the vicinity of the marijuana or mere knowledge of its physical location, standing alone, however, does not constitute possession.

The final instruction revealed:

that because of this, the district judge should have at least referred to those instructions highlighting his own theory of the case in clarifying the matter for the jury.

■ Laurelez' claim that the court's response to the jury's request for clarification was, in effect, non-responsive is without merit. Once questions arose among the jurors as to the original instructions, the "trial court had to exercise its sound discretion in determining what type of supplementary instructions should be given to a deliberating jury that seeks clarification of the law." *United States v. Zabic*, 745 F.2d 464, 475 (7th Cir.1984), *quoting Davis v. Greer*, 675 F.2d 141, 145 (7th Cir.), *cert. denied*, 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982). As the substance of the supplementary instructions are vested within the sound discretion of the district judge, we will reverse only if the district court abused its discretion in this regard. *Papia*, 560 F.2d at 843.

Rather than issue a separate instruction, the district court chose to refer the jurors to those original instructions which he believed best answered the question at hand. While those instructions did define the government's theory that Laurelez aided and abetted the possession of the marijuana seized from Randall's shed, the district court carefully admonished the jurors to avoid singling out certain instructions and discarding others. Moreover, the jurors were told to determine the bearing, *if any,* the highlighted instructions had with respect to their request for clarification of the law. That the highlighted instructions stated the law with respect to those issues fairly and accurately is not contested. We conclude therefore, that the district judge properly exercised his broad discretion in responding to the jury's inquiry.

Finding no merit to the other issues raised in connection with his convictions, we turn to address the issues Laurelez raises in connection with his sentencing. Laurelez was assigned a total offense level of 29 for his money laundering conviction. His drug convictions yielded a total offense level of 28. Laurelez raises three issues with respect to his sentencing: (1) the district court erred in determining that the value of the funds involved in the money laundering scheme exceeded more than $100,000 which in turn led to a one level increase to his base offense level for the offense; (2) the district court erred in finding that Laurelez was an organizer, leader, manager, or supervisor within the conspiracy's hierarchy, which led to a two level enhancement under both the money laundering and drug convictions; and, (3) the district court erred in rejecting his argument that his assigned criminal history category significantly overrepresented his criminal history. We address these issues in turn.

■ Laurelez was convicted of laundering monetary instruments in violation of 18 U.S.C. Sec. 1956(a)(1)(A) which resulted in the application of Guideline Section 2S1.-1(a)(1). Under that Guideline, Laurelez received a base offense level of 23. Section 2S1.1(b)(1) mandates a three level increase in the event "the defendant knew that the funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances...." Thereafter, increases are mandated under Section 2S1.-1(b)(2) depending on the total value of the funds found to have been involved in the offense. The district judge increased Laurelez' offense level under Section 2S1.-1(b)(2)(B) based on his finding that the value of the funds involved in the money laundering scheme exceeded $100,000. Finally, Laurelez received a two level in-

A defendant need not personally perform every act constituting the crime charged. Any person who knowingly participates in the commission of a crime may be found guilty of that crime.

Any person who knowingly aids, abets, counsels, commands, induces or procures the commission of a crime is guilty of that crime.

However, that person must knowingly associate himself or herself with the criminal venture, participate in it, and try to make it succeed.

Presence at the scene of a crime and knowledge that a crime is being committed are not sufficient standing alone to establish a defendant's guilt.

crease based on his leadership and organizational role within the conspiracy pursuant to Guideline Section 3B1.1, yielding a total offense level of 29 for the money laundering conviction. Laurelez challenges the latter two findings.

The funds reflected in the portion of the indictment containing the money laundering counts amounted to $24,561. At trial, however, the government submitted evidence demonstrating that Laurelez and his wife had received funds totalling $64,036 from McCoy and Atterson. In determining the value of the funds involved in the money laundering scheme, the district court accepted the recommendation contained in Laurelez' pre-sentence investigation report providing that the total value of the funds involved in the money laundering scheme exceeded $100,000. This figure was arrived at by multiplying the total quantity of marijuana found to have been involved in the conspiracy (220 pounds) by the approximate street value of the marijuana which testimony at trial revealed to be between $550 to $750 per pound.

■■■■■■ In reviewing sentences imposed under the Guidelines, we extend considerable deference to the district court's application of the Guidelines to the facts. *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989). We will affirm the district court's sentence so long as it results from a proper application of the Guidelines to facts not found to be clearly erroneous. *Id.* Here we are called upon to interpret the meaning of the phrase "value of the funds" as it is used in Guideline Section 2S1.1(b)(2). Both Laurelez and the government suggest that *United States v. White*, 888 F.2d 490 (7th Cir.1989) supports their respective positions as to what Congress intended the phrase to connote.

In *White*, we determined that under the Guidelines, drugs, although not included in the offense for which a defendant was convicted, were to be included in the amount used to compute the base offense. score. This finding, however, was based on our interpretation of the interplay between Guideline Sections 1B1.3(a)(2) and 3D1.2(d) from which we concluded that when the Guidelines provide tables that cumulate the amount sold or stolen, acts that "were part of the same course of conduct or common scheme or plan as the offense of conviction" are to be included in the computation of the amount upon which the offense level depends, without reference to conviction. *Id.* at 496–97.

Unquestionably, the $64,036 representing cashier checks and Western Union transfers to Laurelez would figure into the computation of the "total value of funds" under the money laundering scheme based on *White* since those funds were clearly part "of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* Still the question before us is whether the district judge erred by adding to the total value of the funds actually found to have been laundered, the figure representing the approximate street value of the total quantity of marijuana found to have been involved in the drug conspiracy.

The Guideline governing money laundering transactions mandates a sentence enhancement in the event the defendant knew that the funds involved in the money laundering scheme were the proceeds of unlawful activity involving narcotics or other controlled substances. The district court increased Laurelez' sentence three levels under this Guideline since Laurelez knew that the funds represented proceeds from the marijuana distribution. To then include the value of those drugs in computing the total value of the funds involved in the money laundering scheme would result in Laurelez' sentence being doubly-enhanced due to the fact that drugs were involved in the money laundering scheme, a result we do not think Congress intended in enacting this particular Guideline. Thus this aspect of Laurelez' sentence must be revisited by the district court.

■■■■ Laurelez also challenges the district court's finding that he was an organizer, manager, or leader within the conspiracy's hierarchy. The district court increased Laurelez' sentence two levels under both the money laundering and drug convictions pursuant to Guideline Section 3B1.1(c). This Guideline mandates a two

level increase "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity...." U.S.S.G. Section 3B1.1(c). Although the Guideline lacks definitions for these terms, its commentary provides factors a court should consider with respect to its application. Those factors include, but are not limited to the:

exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. U.S.S.G. Section 3B1.1, comment. (n.3).

■■■ We emphasize that the question of Laurelez' role in the conspiracy was a question of fact for the district court to determine. *Herrera,* 878 F.2d at 1000. We must accept the district court's finding in this regard unless it is clearly erroneous. *Id.* In discussing whether an enhancement was warranted under this particular Guideline, the district court observed that Laurelez was "the bank, the conduit, and the source. Without Laurelez, Atterson had nothing, as far as drugs were concerned." Sentencing Transcript at 16. Earlier in the proceedings, after the verdicts had been announced, the court characterized Laurelez' role in the conspiracy as follows:

[i]f there is a hierarchy within the conspiracy, certainly Mr. Laurelez ranks at the top of the hierarchy. He was the procurer, he was the recipient of the money for the marijuana, which he may or may not have passed on to others. I have already stated I suspect it was passed on to others. And certainly, even if that [is not] true, that does not relieve him of his position within the particular conspiracy charged. I accept the Proba-

tion Officer's conclusion that Mr. Laurelez was an organizer, leader, manager, or supervisor within the meaning of the guidelines. Trial Transcript at 1003.

On the basis of these findings, Laurelez received the two level enhancement authorized by Section 3B1.1(c). We find no error in the enhancement.[4]

### D. *Timothy C. Atterson*

■■■ In addition to joining the other defendants in challenging the quantity of marijuana found to have been involved in the conspiracy, Timothy Atterson raises one additional issue for our review. Atterson challenges the district court's failure to give him credit for accepting responsibility for his criminal behavior under Guideline Section 3E1.1. This Guideline authorizes a two-level reduction when the "defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." U.S.S.G. Section 3E1.1.

Prior to his sentencing hearing, Atterson prepared a statement in which he detailed, among other things, the number of trips he made to Arizona, the quantity of marijuana he purchased in Arizona, and the prices the marijuana commanded. He also disclosed the income he had received from his marijuana sales on his 1988 Federal tax return. At his sentencing hearing, Atterson advised the court that he had met with a representative from the U.S. Attorney's Office along with other officials, providing them with information concerning his marijuana distribution network. He hesitated, however, when questioned about his willingness to provide testimony in connection with the information he provided.

Atterson's probation officer declined to recommend the adjustment in part because Atterson had tested positive for substance abuse following his arraignment. The pro-

---

**4.** Laurelez' final challenge to his sentence is directed toward the district court's refusal to depart downward from his finding that his criminal history category was II. This finding was based on Laurelez' two previous convictions, one for felony theft, the other for driving while intoxicated. Laurelez' challenge is based on his claim that his Criminal History Category significantly overrepresented his criminal past. Since Laurelez' challenge is based on the district court's refusal to depart from the guidelines, we lack jurisdiction to consider this claim. *United States v. Franz,* 886 F.2d 973 (7th Cir.1989); *United States v. Franco,* 909 F.2d 1042 (7th Cir. 1990).

bation officer, however, was unaware of the meetings taking place with the U.S. Attorney's office at the time he prepared Atterson's pre-sentence report.[5] The government supported Atterson's request for a reduction at the sentencing hearing.

The district judge refused to credit Atterson with the two-level reduction. While acknowledging Atterson's assistance, the court was unimpressed by Atterson's reluctance to commit to testifying at any grand jury proceedings resulting from the information he had provided to the government. Characterizing Atterson's promises as illusory, the district court opined that Atterson's continued cooperation rested on whether or not he received a reduced sentence under the Guideline and had nothing to do with his willingness to accept responsibility for his conduct.

While this may present a close question, we decline to disturb the district court's refusal to credit Atterson with acceptance of responsibility. At the sentencing hearing, the district judge stated that the evidence in the case coupled with Atterson's conduct and responses to the court led the court to "have grave doubts about the veracity of anything he would tell the Court." Sentencing Transcript at 22. The district judge observed that Atterson was motivated to say or do anything to advance his cause, including making illusory promises to the government in exchange for a favorable sentencing recommendation. Since the district court was in the best position to determine this issue and had ample opportunity to assess Atterson's character and veracity, we can not conclude that the court's failure to award credit under this Guideline resulted in an abuse of its discretion.

### 3. THE GOVERNMENT'S CROSS–APPEAL

■ The facts developed at Atterson's sentencing hearing reveal that agents,

upon executing the search warrant at Atterson's home, found 894 grams of marijuana in Atterson's freezer and small amounts of cocaine and marijuana in his kitchen, living room, and bedroom. Records pertaining to Atterson's drug dealings were also discovered at his home. A triple-beam balancing scale was discovered in a closet. Two loaded handguns were found in a drawer in the headboard to Atterson's bed. Cash totalling $1000 was found in another headboard drawer.

Atterson did not dispute these facts at his sentencing hearing. He testified that he had owned one of the guns for 18 years and had rarely fired it. The other gun belonged to a friend. Atterson conceded that the guns were kept in a drawer next to a drawer containing a large amount of cash. Atterson advised the court that he had never carried the gun in connection with any of his drug-related activities. The government requested an enhancement based on Guideline Section 2D1.1(b) which mandates a two-level increase for offenses involving drugs "[i]f a dangerous weapon (including a firearm) was possessed during the commission of the offense...." U.S. S.G. Section 2D1.1(b).

The commentary to Section 2D1.1 provides in part:

> [t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, *the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.* U.S.S.G. Section 2D1.1, comment. n. 3 (emphasis added).

The district judge was obviously troubled by the "clearly improbable" standard set

---

**5.** At the sentencing hearing, the probation officer refused to change his posture with respect to his initial finding that Atterson had failed to accept responsibility for his conduct and suggested that *Guideline Section 5K1.1 was better suited to address Atterson's assistance to the government.* Section 5K1.1 allows the district court, upon the government's motion, to depart from the Guidelines if it determines that the defendant has indeed provided "substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. Section 5K1.1.

forth in the Guideline's commentary. Ultimately, the court ruled that the Guideline did not apply since there was no evidence to suggest that Atterson had ever carried the gun in connection with any of his drug-related activities.

In *United States v. Franklin*, 896 F.2d 1063 (7th Cir.1990), we rejected defendant's argument that the mere presence of loaded firearms in his residence did not warrant the application of Section 2D1.1(b)(1) since the evidence did not suggest that the guns were used in connection with the drug charges he was convicted of. *Id.* at 1065–66. We rejected a similar claim in *Durrive*, 902 F.2d at 1231–32. In *Durrive*, we observed that the loaded weapon, which was found in the defendant's home at the time of his arrest, "was stored in a location that was inaccessible to strangers and casual visitors but readily accessible to Durrive." *Id.* at 1232. Moreover, we observed that Section 2D1.1(b)(1) does not require that the government show a connection between the weapon and the offense, only that the weapon was possessed during the offense. *Id.* Those observations apply with equal force to the present case. Clearly the presence of two loaded handguns stored in a headboard also used to store large sums of cash, in a home found to have drugs strewn throughout its rooms, cannot be likened to the "unloaded hunting rifle stored in the closet" example found in the Guideline's commentary. Although we defer considerably to the district court's findings in this regard, on the record before us we are compelled to conclude that the district court erred in failing to apply this Guideline in Atterson's case.

Thus, in accordance with this opinion, the convictions of each of the defendants are AFFIRMED. We remand the money laundering count of Laurelez' case to the district court so that it may vacate the sentence imposed for that count and resentence Laurelez in accordance with this opinion. We also remand Timothy Atterson's case so that the district court may vacate the sentence imposed and resentence Atterson in accordance with our findings regarding the application of Guideline Section 2D1.1(b)(1).