UNITED STATES of America,
Plaintiff–Appellee,

v.

Sonia VILLASENOR, Sylvestre Casares, Donald Angotti, and Robert W. Harris, Defendants–Appellants.

Nos. 91–1107, 91–1108, 91–1596 and 91–1756.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1992.

Decided Oct. 8, 1992.

Rehearing Denied Nov. 9, 1992.

Joseph R. Wall, Chris R. Larsen (argued), Asst. U.S. Attys., Milwaukee, Wis., for U.S.

Robert L. Rascia (argued), Rascia & Rascia, Chicago, Ill., for Sonia Villasenor.

Charles W. Jones, Jr., Kirsten K. McWilliams (argued), Charles W. Jones & Associates, Milwaukee, Wis., for Sylvestre Casares.

. David S. Morris, Chicago, Ill. (argued), for Donald Angotti.

Paul G. Bonneson, Brookfield, Wis. (argued), for Robert W. Harris.

Before CUMMINGS and COFFEY, Circuit Judges, and GIBSON, Senior Circuit Judge.[1]

FLOYD R. GIBSON, Senior Circuit Judge.

Sonia Villasenor and Sylvestre Casares appeal their convictions and sentences for various drug-related offenses. Donald Angotti and Robert Harris appeal the sentences imposed upon them after they pleaded guilty to various drug-related offenses. We affirm the district court in all respects save one; we remand Harris' appeal with directions.

## I. BACKGROUND

The pertinent facts of this case viewed in the light most favorable to the government, *see United States v. Atterson*, 926 F.2d 649, 654–55 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991), are as follows: On May 22, 1990, Harris was observed selling fourteen grams of cocaine to a confidential informant working for the Kenosha County, Wisconsin Controlled Substances Unit. Harris' roommate, Angotti, sold ⅛ ounce of cocaine to the same informant on May 25; he sold the informant an additional ounce of cocaine on June 16. On June 20, 1990, Harris sold fourteen grams of cocaine to an undercover officer. Law enforcement officials arranged a controlled purchase of two ounces of cocaine from Angotti, with the sale to take place on June 25 at Harris' and Angotti's residence. After the buyer gave the money for this purchase to Angotti, Angotti told him to return in one hour to pick up the drugs. Detectives watched Angotti go from his house to Michael Cundari's house, then return. After the hour had passed, the buyer returned to Angotti's home and completed the sale.

After the sale was completed, police officers executed a search warrant at Harris' and Angotti's residence and found approximately twenty-one grams of cocaine, two digital scales, cocaine folds (pieces of paper used to package cocaine for sale), and other drug paraphernalia. That same evening, police officers executed a search warrant at Cundari's house and found over 335 grams of cocaine, a scale, a police scanner,

1. The Honorable Floyd R. Gibson, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

various firearms, and a device used to detect electronic surveillance equipment. Cundari was arrested, whereupon he immediately expressed a desire to cooperate with the police. He told the officers that his cocaine suppliers were scheduled to arrive at his house at approximately 8:30 that evening to collect a partial payment on a $17,500 debt Cundari owed them. Cundari identified his sources as a Mexican male and female known to him as Pepe and Sonia, both of whom lived in or near Cicero, Illinois. Cundari further explained that both Pepe and Sonia carried pagers, and he showed the officers a notebook in which he had written their pager numbers.

At 8:10 that evening, Casares and Villasenor arrived at Cundari's house. The car they arrived in had Illinois license plates. One of the law enforcement officers posed as Cundari's friend and told Casares and Villasenor that he would pay $4,000 of Cundari's debt. Villasenor, acting as a translator, related this message to Casares (who does not speak English). Villasenor and Casares talked to each other for a few moments, then Villasenor told the officer that a $4,000 payment would be inadequate because they had come to collect the entire $17,500. At this time, Casares and Villasenor were arrested and searched; both possessed pagers that corresponded to the numbers provided by Cundari and written in his notebook. Phone bills found in Cundari's house demonstrated that numerous calls had been made from Cundari's phone to those pagers in the preceding two months. Additionally, Casares had a small vial containing 4/10 of a gram of cocaine. A search of the car Casares and Villasenor arrived in revealed a note containing the name "Benny" and Cundari's phone number. (At trial, Cundari testified that "Benny" was his nickname). This note was hidden in a police badge and identification from Cicero, Illinois that bore Villasenor's name.[2]

Casares, Villasenor, Angotti, and Harris were all charged with conspiracy to distribute cocaine. Additionally, Harris was charged with two counts of knowingly distributing cocaine, Angotti was charged with three counts of knowingly distributing cocaine, and Casares and Villasenor were charged with one count of possessing cocaine with the intent to distribute and one count of travelling in interstate commerce with the intent to carry on unlawful activity. Harris pleaded guilty to the two distribution counts; in return, the government dismissed the conspiracy count against him. Angotti pleaded guilty to the conspiracy count; in return, the government dismissed the three distribution counts against him. Casares and Villasenor pleaded not guilty and proceeded to trial.

At trial, Cundari testified that he first met Casares (known to him at the time as Pepe) sometime around the beginning of 1987, and that Casares was assisting Cundari's drug supplier. In early 1989, Casares and Villasenor went to Cundari's home to find out whether he was still selling drugs and to inform him they could supply him with drugs. In the summer of 1989, Cundari's supplier was arrested; at that time, Casares and Villasenor visited Cundari's house again. Due to Cundari's lack of cash and Casares' and Villasenor's unwillingness to advance him any quantity of cocaine, an agreement was not reached. In early 1990, Cundari paged Villasenor and arranged a meeting to discuss the possibility of buying some drugs from them. Villasenor, Cundari, and Casares met at Cundari's home, but no agreement was reached.

In May of 1990, Cundari paged both numbers, and Villasenor telephoned Cundari. An agreement for the sale of five ounces of cocaine was reached; the terms of the agreement allowed Cundari to take the cocaine and pay for it after he had raised the money to do so. Villasenor and Casares delivered the cocaine to Cundari at a gas station in Cicero. Two or three days after the transfer, Villasenor and Casares went to Cundari's house to find out when he would have the money, and Cundari

---

**2.** At trial, police officers testified they had not made any attempts to determine whether this badge was authentic or properly issued to Villasenor. The record on appeal continues to be silent on this matter.

gave them a partial payment. On two later occasions, Villasenor and Casares went to Cundari's house to pick up payments.

A second transaction took place on June 17. The arrangements for this delivery of cocaine were the same as those for the May transaction. The quantity originally agreed to was five ounces, but when the transaction took place Casares told Cundari they had more cocaine than planned, and Casares put a package containing 17.5 ounces in the trunk of Cundari's car. Five days later, Villasenor called to see if Cundari had any money, at which time arrangements were made for the fateful June 25 visit.

## II. DISCUSSION

### A. Villasenor's Appeal

#### 1. *Conviction*

Villasenor argues there was insufficient evidence to support her conviction, and bases this argument on Cundari's lack of credibility. Specifically, she argues Cundari was inherently untrustworthy because he had substantial memory loss due to a long history of drug use, and because the government promised to move for a downward departure in his sentence. She also argues Cundari's testimony that he owed her and Casares $17,500 is unbelievable because the book he used to keep track of his drug-related debts did not contain an entry for either Villasenor or Casares, and because it is highly unlikely Villasenor and Casares would have turned down a partial payment on the debt, given that a partial payment is better than no payment at all.

■■■■ These arguments certainly cast doubts on Cundari's credibility. However, "[m]ere inconsistencies in the witness' testimony do not render it legally incredible." *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989). It is the jury's function—not this court's function—to weigh and consider these arguments and make the final decision about the witness' credibility. *E.g., United States v. Jackson,* 935 F.2d 832, 843 (7th Cir.1991). "[W]e must affirm so long as 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' In making this determination, we look to all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the government. We must affirm unless the record is barren of any evidence, regardless of its weight, from which the trier of fact could find guilt beyond a reasonable doubt." *Atterson,* 926 F.2d at 655 (quoting *United States v. Penson,* 896 F.2d 1087, 1093 (7th Cir.1990)). The jury in this case was made aware of the inconsistencies and aspersions surrounding Cundari's testimony. The jury was also made aware of facts that tended to support Cundari's testimony, the most notable support being the testimony of the police officer who heard Villasenor say she and Casares would not accept a partial payment on the debt because they expected full payment. The resolution of Cundari's credibility was a matter for the jury, and in deciding to convict Villasenor it also implicitly decided to believe Cundari's testimony. The record contains nothing to suggest this was, as a matter of law, improper.

■■■■ Villasenor also contends that even if the jury could believe Cundari's testimony, the evidence was still insufficient to prove that she was a knowing member of the conspiracy. She does not deny the existence of a conspiracy, but contends that Cundari's testimony proved she had a social relationship with Casares and served as his translator and did not prove she was a member of the conspiracy. We disagree. "To prove that a defendant was a member of a conspiracy the government must present sufficient evidence to demonstrate that the defendant knew of the conspiracy and that [s]he intended to join and associate h[er]self with its criminal design and purpose." *United States v. Auerbach,* 913 F.2d 407, 414–15 (7th Cir.1990). Although we review the record for substantial evidence of Villasenor's involvement in the conspiracy, we may still "accept circumstantial evidence as support, even sole support, for a conviction." *United States v. Durrive,* 902 F.2d 1221, 1229 (7th Cir.1990). In the case at bar, the record contains extensive evidence that Villasenor knew of

the conspiracy; after all, she translated every conversation for Casares. Proof that she intended to associate herself with this criminal conduct can be inferred from the following facts: she carried a pager so Cundari (and, presumably, others) could contact her, acted as a translator for non-Spanish speaking conspirators (including Cundari), accompanied Casares on trips to deliver drugs and pick up money, telephoned Cundari to find out when payment would be forthcoming, and possessed a note with Cundari's nickname and telephone number. We believe these facts constitute substantial evidence in support of the jury's verdict finding Villasenor was a knowing member of the conspiracy.

### 2. *Sentencing*

Villasenor raises two challenges to the district court's application of the Sentencing Guidelines. First, she alleges the district court erred in finding that 576.5 grams of cocaine were involved in this conspiracy. Though conceding 361.6 grams of cocaine were seized the night Cundari was arrested, and that this amount of cocaine can be attributed to the conspiracy, Villasenor contends the only evidence of the other 214.9 grams of cocaine was Cundari's testimony. Recounting her earlier arguments about Cundari's credibility, Villasenor contends the court erred in crediting his testimony and including this extra amount in the conspiracy's activities.

 Factual matters pertinent to the application of the Guidelines must be proved to the sentencing court by a preponderance of the evidence. *E.g., United States v. White*, 888 F.2d 490, 499 (7th Cir.1989). We will reverse the sentencing court's findings only if they are clearly erroneous, *e.g., United States v. Hassan*, 927 F.2d 303, 309 (7th Cir.1991), and we are particularly reluctant to disturb the lower court's determinations regarding credibility, as "[d]eterminations of credibility are distinctly decisions to be made by the district court." *United States v. Oduloye*, 924 F.2d 116, 118 (7th Cir.) (per curiam), *cert. denied,* — U.S. —, 111 S.Ct. 2813, 115 L.Ed.2d 985 (1991). As we stated with

regard to her conviction, the arguments Villasenor raises definitely bear on Cundari's credibility. However, it is the district court's job to assess the credibility of witnesses who testify on matters relating to sentencing. We are not "left with the definite and firm conviction that a mistake has been committed by the district court," *Hassan*, 927 F.2d at 309 (quotation omitted); therefore, we affirm the district court's factual finding that the conspiracy conducted drug transactions involving 576.5 grams of cocaine.

Villasenor also contends the court erred in refusing to grant a downward departure because of her minimal participation in the conspiracy. Section 3B1.2 of the Guidelines permits a four level decrease in the offense level for minimal participants, a two level decrease for minor participants, and a three level decrease for those participants whose actions fall between minimal and minor participation. The Application Notes to this section explain that "a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n.3). Villasenor contends the evidence at trial proved she was nothing more than a translator; therefore qualifying her as a minor participant and entitling her to a two level decrease in her offense level.

 As with all other factual determinations made at sentencing, we review the district court's findings relative to § 3B1.2 for clear error, *United States v. Franklin*, 902 F.2d 501, 509–10 (7th Cir.), *cert. denied sub nom. Mann v. United States*, — U.S. —, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990), and we must be mindful that application of this section "is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2 comment. (backg'd). In denying Villasenor the benefits of this section, the district court relied primarily on her possession of a pager. The district court noted that Villasenor was not involved in just one transaction, that she traveled in order to facilitate the conspiracy, and actively participated in the discussions that initiated the conspiracy. She was, in short, an inte-

gral and active member of the conspiracy whose duties happened to include translating. The district court's view of the facts is amply supported by the record and is therefore not clearly erroneous.

### B. Casares' Appeal

#### 1. *Conviction*

Casares' arguments relative to his conviction primarily focus on Cundari's credibility. In this respect, they mirror the arguments advanced by his co-defendant, Villasenor; consequently, we reject Casares' challenge for the same reasons we reject Villasenor's. *See* Part II.A, *supra.*

■ Casares also contends there was insufficient evidence to prove that he travelled in interstate commerce to facilitate illegal activity. The evidence demonstrating that Casares travelled from Illinois to Wisconsin to collect payments for illegal drugs resolves this issue against Casares. *See United States v. Campione*, 942 F.2d 429, 434–35 (7th Cir.1991) ("[T]he interstate use need not be indispensable to the illegal activity, it is enough that the use facilitates the illegal activity.") (quotation omitted).

#### 2. *Sentencing*

■ Casares challenges the district court's decision to add three points to his criminal history score. This addition was made pursuant to U.S.S.G. § 4A1.3, which provides that an upward departure may be justified when "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct...." This may include information demonstrating that the defendant had previously committed "similar adult criminal conduct not resulting in a criminal conviction." *Id.* § 4A1.3(e). "[P]rior criminal conduct need only be proven by a preponderance of the evidence to support a departure." *United States v. Terry*, 930 F.2d 542, 545 (7th Cir.1991).

In awarding the three point increase to Casares' criminal history score, the district court relied on Cundari's trial testimony to the effect that he (Cundari) had first engaged in drug transactions involving Casares in the middle of 1987—several years before the date the conspiracy was alleged to have begun. Casares contends this information is insufficient to support the increase due to both Cundari's memory loss and his prior inconsistent statement to law enforcement officials concerning the date he began buying cocaine from Casares. We reject Casares' position for substantially the same reason we reject his challenge to his conviction—Cundari's testimony is not unreliable simply because Cundari is impeachable. We must accept the district court's findings unless they are clearly erroneous, *United States v. Gaddy*, 909 F.2d 196, 199 (7th Cir.1990), and there is no clear error simply because the district court believed Cundari in spite of the defense attorneys' attempts to impeach him.

■ Casares also contends his trial counsel was ineffective for failing to object to the factual basis for this increase in Casares' criminal history score.[3] Assuming, without deciding, that the trial counsel's "representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), we conclude this failing did not affect the district court's judgment and Casares was not prejudiced. The district court based its decision to increase Casares' criminal history score upon information contained in the trial transcript. Having presided at the trial and reviewed the transcript, the district judge was undoubtedly aware of the attacks on Cundari's credibility. At the sentencing hearing, the district court mentioned some of the attacks, but explained he still found Cundari's testimony credible because some of it was corroborated. The district court was aware of the facts that undermined Cundari's credibility, so Casares was not prejudiced by his attorney's failure to bring those facts to the court's

---

**3.** Casares' trial counsel did raise a due process objection, which has not been raised on appeal. However, his trial counsel specifically said he had "nothing to offer" on the factual allegations raised by Cundari's testimony.

attention. This lack of prejudice defeats Casares' claim of ineffective assistance of counsel. *Id.* at 687, 691–92, 104 S.Ct. at 2065, 2066–67.

## C. Angotti's Appeal

■ Angotti challenges the sentencing court's determination that he was accountable for the conspiracy's distribution of more than 500 grams of cocaine. The court determined that, as part of the conspiracy to which Angotti had pleaded guilty, Angotti was responsible for the 89 grams he sold to a confidential informant in May and June of 1990 and 861 grams he purchased from Cundari in the latter part of 1989.[4] Angotti concedes his accountability for the sales to the confidential informant, but contends there was insufficient proof that the purchases he made in 1989 were part of the same scheme. He also contends these purchases were for personal use and not for resale.

"[A] district court must increase a defendant's base offense level to account for relevant conduct, which includes drugs from any acts that were part of the same course of conduct or common scheme or plan as the convicted offense, regardless of whether the defendant was charged with or convicted of carrying out those acts." *United States v. Duarte,* 950 F.2d 1255, 1263 (7th Cir.1991) (quotation omitted), *cert. denied,* — U.S. —, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992). At Angotti's sentencing hearing, Cundari testified that from April 1989 to June 1990 he regularly sold Angotti one to four ounces of cocaine per week, and that he told Angotti the identity of his suppliers. Angotti, who testified at his sentencing hearing, stated that he used some of the drugs personally but also indicated he sold enough of the drugs to raise money to repay Cundari. Sentencing Transcript at 55. Finally, the search of Angotti's home revealed items that are normally associated with the distribution of

drugs—most notably, the officers discovered two digital gram scales, one of which was electronic. Based on these facts, the district court's determination that Angotti's participation in the conspiracy involved more than 500 grams of cocaine was not clearly erroneous and we affirm the district court.

## D. Harris' Appeal

Harris contends he should be resentenced because the district court failed to make written findings and attach them to the presentence investigation report (PSI) as required by Fed.R.Crim.Pro. 32(c)(3)(D). This rule provides as follows:

> If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons.

The government concedes this rule was violated in that the district court relied on factual matters contained in the PSI but failed to attach written findings; however, it contends resentencing is not necessary.

■ The requirement of written findings is designed to serve two purposes: it protects a defendant's due process rights by insuring his sentence is based on accurate information and it "provide[s] a clear record of the disposition and resolution of controverted facts in the presentence report." *United States v. Eschweiler,* 782 F.2d 1385, 1387 (7th Cir.1986). This latter

---

**4.** The government also argued that the 490 grams of cocaine Villasenor and Casares sold to Cundari in June 1990 should have been considered a part of the same course of conduct. The district court's findings with regard to this amount are less than clear; apparently, in a

"burst of Christian charity," the court determined Angotti could not have foreseen this transaction and therefore did not assign Angotti any criminal responsibility for it. Sentencing Transcript at 79.

purpose is intended to assist "both appellate courts in their review of sentencing hearings and administrative agencies that use the report in their own decisionmaking procedures." *Id.* (footnote omitted).

An examination of our cases discussing Rule 32(c)(3)(D) reveals that we have remanded for resentencing only if the first purpose of the rule has been infringed in some way. In *Eschweiler*, we declined to remand for resentencing because the transcript of the sentencing hearing clearly demonstrated that the judge did not consider the disputed facts in deciding the defendant's sentence. *Id.* at 1389–90. We further supported our holding by referencing Fed.R.Crim.P. 52(a), which directs that "[a]ny error ... which does not affect substantial rights shall be disregarded." In *United States v. Moran*, 845 F.2d 135 (7th Cir.1988), we did not remand for resentencing because the record clearly revealed that the district judge had made factual findings, even though those findings were delivered orally and were not reduced to writing. *Id.* at 139. Similarly, in *United States v. Rodriguez–Luna*, 937 F.2d 1208 (7th Cir.1991), we declined to remand for resentencing, holding that the "defendant's due process rights [we]re not implicated because the district judge clearly made a finding as to the disposition of the dispute about the relevant quantity of cocaine." *Id.* at 1213. Our review of the transcript in this case reveals the district court allowed Harris an opportunity to present witnesses and arguments addressing the disputed factual matters, and that the judge made findings of fact as to the amount of drugs involved. We discern no denial of any of Harris' due process rights; consequently, we will not remand for resentencing.[5]

However, the second purpose has not been fully served. Although we have been able to conduct a review based on the transcript,[6] we are not the only body that is likely to examine the district court's actions in this case. Consequently, consistent with our prior cases addressing this issue, we remand for the limited purpose of

affording the district court an opportunity to make and attach written findings to the PSI. *E.g., Eschweiler*, 782 F.2d at 1391, 1393. Once again, we emphasize that "strict compliance with Rule 32(c)(3)(D) is not discretionary but mandatory," and ask the district courts to make a more diligent effort to comply with the rule. *Rodriguez–Luna*, 937 F.2d at 1214.

## III. CONCLUSION

We affirm all four defendants' appeals in all respects, but remand Harris' appeal for the limited purpose of allowing the district court to make written findings of fact about the disputed matters contained in the PSI and to attach those findings to the PSI.

---

5. Harris presents no challenges to the district court's findings of fact or conclusions of law relative to his sentence, so there is no need for us to examine his sentence any further than the due process concerns of Rule 32(c)(3)(D) requires.

6. We are therefore not faced with a situation in which the district court's oral findings are insufficient to allow for meaningful appellate review, and hence do not suggest what action we might take when faced with such a circumstance.