**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jose L. YANEZ and Kenneth Torres, Defendants–Appellants.**

**Nos. 92–1526, 92–1677.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 12, 1992.

Decided Feb. 10, 1993.

John H. Campbell (argued), Office of the U.S. Atty., Peoria, IL, for plaintiff-appellee in No. 92–1677.

Ted Breckenfelder (argued), Bozeman, Neighbour, Patton & Noe, Moline, IL, for Kenneth Torres in No. 92–1677.

K. Tate Chambers (argued), Darilynn J. Knauss, Asst. U.S. Attys., Peoria, IL, for plaintiff-appellee in No. 92–1526.

Mike Wassell, Duane Thompson (argued), Braud & Warner, Rock Island, IL, Charles L. Roberts, El Paso, TX, for Jose L. Yanez in No. 92–1526.

Before FLAUM and EASTERBROOK, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

After pleading guilty to federal felony offenses, two members of a drug conspiracy now allege various errors during their sentencing hearings before a district court. For the reasons stated below, we find no error and affirm the sentences.

## I. BACKGROUND

A shopper at the Quad–City Meat Market in Davenport, Iowa, could potentially get a lot more than ground beef. The proprietor of the business, Jose Luis Yanez, used the meat market as a front for his illicit drug distribution network. Law enforcement officials began investigating Yanez in April 1988. Partially through judicially-authorized phone taps of Yanez's business and home, investigators discovered a conspiracy that brought drugs from Mexico to Illinois, Iowa, Massachusetts, Florida, and California.

In a tape-recorded conversation with an undercover Drug Enforcement Administration agent, Yanez said he had been trafficking in drugs for eighteen years and laundered his money through the sale of cars, Mexican grocery stores, and a limousine service. He admitted distributing 500 to 700 pounds of marijuana every two weeks. In addition to marijuana, the conspiracy also distributed cocaine and heroin.

Yanez directed twelve people in this conspiracy, including Kenneth Torres. Torres's connection with the conspiracy was highlighted by a trip to Florida. Although he was unemployed and had lost his house in Massachusetts by foreclosure, Torres stayed in a $140–per–night Florida hotel room for five weeks in the summer of 1990. From the hotel room, Torres conducted phone calls concerning drug transactions with Yanez and others at the Quad–City Meat Market. The Government also intercepted telephone conversations between these parties when Torres was at his home in Massachusetts. In fact, when Torres was hospitalized in Massachusetts for appendicitis, he conversed with Yanez by using a cellular telephone from the hospital.

On October 28, 1990, Yanez was arrested in Illinois. Two days later, Torres was arrested in Florida and removed to Illinois. On November 2, 1990, a grand jury indicted Yanez, Torres, and eleven other individuals for various drug-related offenses. Yanez was charged with eleven crimes and on June 18, 1991, he pled guilty to conspiracy to distribute a controlled substance, 21 U.S.C. § 846, attempting to possess with intent to distribute a controlled substance, 21 U.S.C. § 846, and money laundering, 18 U.S.C. § 1956(a)(1)(B)(i). The remaining counts were dismissed.

Torres was also indicted for conspiracy to distribute a controlled substance and charged by way of information with use of a communication facility to commit the offense of distribution of marijuana, 21 U.S.C. § 843(b). On September 11, 1991, the day his trial was to begin, Torres reached a plea agreement with the Government. Pursuant to that agreement, Torres pled guilty to use of a communication facility to commit the offense of distribution of marijuana and the conspiracy count was dismissed.

## II. THE SENTENCING HEARINGS

The sentencing hearings of the conspirators took four days. Yanez was first, with hearings on December 13, 1991, and February 18, 1992, and Torres and others were sentenced on February 19 and 20, 1992. Yanez received life imprisonment for conspiracy to distribute a controlled substance. He also received a concurrent sentence of 480 months (forty years) for attempting to possess with intent to distribute a controlled substance, and a concurrent sen-

tence of 240 months (twenty years) for money laundering. Additionally, the court ordered Yanez to serve a period of supervised release for life and imposed a $2,000 fine. Torres was sentenced to eleven months imprisonment, one year supervised release, and a $1,000 fine, for use of a communication facility to commit the offense of distribution of marijuana.

Defendants' sentences were determined according to the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). Under this complex scheme, various crimes are given a "Base Offense Level." Basically, the more levels there are, the longer the sentence will be. Levels may be added to or subtracted from the Base Offense Level depending on the specific characteristics of the crime and the criminal's role in that crime. The final sum of points or levels is known as the "Adjusted Offense Level."

In Yanez's case, the Adjusted Offense Level for his conspiracy and attempt crimes reflected the weight of the drugs he distributed, his role as leader of the conspiracy, his obstruction of justice, and his possession of a weapon. Yanez objected to the Government's characterization of these factors, and his objections were addressed at his sentencing hearings. Torres also objected to his sentence; he contended the Government breached a plea agreement to recommend a two-level reduction for acceptance of responsibility. The court, however, found the plea agreement had not been breached and denied his request for the two-level reduction.

## III. DISCUSSION

Although these two appeals were consolidated for purposes of oral arguments, each Defendant's case must be reviewed separately. We start first with Kenneth Torres.

### A. TORRES

The district court, in Torres's opinion, made two mistakes. First, the court erred in its decision to deny a two-level decrease for acceptance of responsibility under U.S.S.G. § 3E1.1(a). Second, the court erred in not requiring the Government, based upon the plea agreement, to recommend the two-level downward adjustment for acceptance of responsibility.

### 1. ACCEPTANCE OF RESPONSIBILITY

Under the Guidelines, a defendant's offense level may be reduced by two levels if "the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. § 3E1.1(a). The defendant has the burden of proving his entitlement to this reduction. *United States v. Leiva*, 959 F.2d 637 (7th Cir.1992). The district court makes the determination whether the defendant has met his burden, and we do not lightly second-guess the court's opinion.

As the commentary to this section notes, "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1, Application Note 5. Congress has recognized the truth of this observation and mandated that in reviewing a sentence, the court of appeals "shall accept the findings of fact of the district court unless they are clearly erroneous." 18 U.S.C. § 3742(e).

Whether a defendant has accepted responsibility for his crime is a factual determination and thus entitled to the clearly erroneous standard. *United States v. Haddad*, 976 F.2d 1088, 1095 (7th Cir. 1992); *United States v. Osborne*, 931 F.2d 1139, 1154 (7th Cir.1991); *United States v. Larsen*, 909 F.2d 1047, 1049 (7th Cir.1990). Under this standard of review, a finding of fact shall stand unless "after reviewing all the evidence, the appellate court is left 'with the definite and firm conviction that a mistake has been committed.'" *Osborne*, 931 F.2d at 1153 (citations omitted); *accord United States v. Cojab*, 978 F.2d 341, 343 (7th Cir.1992).

Torres contends that the district court erred in its decision to deny a two-

level decrease for acceptance of responsibility. According to Defendant, he fully cooperated with the prosecution, law enforcement agencies, and the district court and was truthful and candid at his sentencing. Judge Mihm, however, found that Torres was untruthful regarding his involvement with the conspiracy.

The district court, for instance, pointed to Torres's inaccurate characterization of his role in telephone conversations among himself, co-conspirator Brian Sylvia, and Yanez. At his sentencing hearing, Torres said his role in the conversations was helping Sylvia track down money stolen from Sylvia's antique business. According to Torres, Sylvia suspected Yanez was involved with the missing money and Sylvia wanted Torres to find out from Yanez if this was true. Torres said this was done by feigning negotiation of a drug deal with Yanez. In Torres's own words, "As far as I was concerned, I wasn't making a real drug deal.... [T]his was just a big game to set up this guy." Sentencing Hearing, Kenneth Torres, Feb. 20, 1992, at 112.

An FBI Special Agent testified to the contrary, saying numerous telephone conversations that he overheard convinced him that Torres was not playing around but instead actively engaged in drug distribution. *Id.* at 63. Torres admitted he used coded words in his conversations with Yanez. Marijuana, for example, was referred to as "green peppers." *Id.* at 116. Yet in response to the district court's questioning, Torres continued to maintain that the drug dealing was just an act. *Id.* at 117.

In ruling on Defendant's request for the two-level reduction, Judge Mihm said he believed Torres had been "untruthful" in the way Torres "characterized his understanding of what was being discussed during that phone conversation." *Id.* at 134. The judge said he believed Torres knew he was negotiating "a serious drug deal ... as opposed to what he stated under oath." *Id.* at 134–35. Based on our review of the record, it is clear that Judge Mihm made the correct credibility determination.

## 2. BREACH OF PLEA AGREEMENT

■ There is no dispute that the Government and Torres entered into an oral plea agreement, nor is there disagreement as to its terms. The only dispute is whether the Government breached the agreement, and whether the court therefore should have ordered specific performance.

The terms of the oral plea agreement, as recorded at the September 11, 1991, Change of Plea Hearing, provided that Torres would plead guilty to an information charging unlawful use of a communication facility to commit the distribution of marijuana. In return, the pending drug conspiracy charge would be dismissed and the Government would make no recommendation as to a specific sentence. The Government, furthermore, would recommend at Torres's sentencing that Defendant receive the two-level downward adjustment for acceptance of responsibility, and would also make known to the court the extent and value of Torres's cooperation in the case.

Regarding the recommendation for the two-level reduction, the Assistant United States Attorney stated, "The defendant realizes, it's my understanding, that that's not a binding determination upon the Court, but is a recommendation of both parties based on the information at this time and based on the defendant's conduct at this time." Record at 246. The court established that Torres agreed these were the terms of the agreement, and that Torres understood the court was not thereby bound by any Government recommendation. *Id.*

Despite the plea agreement, at the sentencing hearing five months later the Government did not recommend Torres be given a two-level downward departure for acceptance of personal responsibility for his criminal conduct pursuant to U.S.S.G. § 3E1.1(a). Torres contends this was a breach of the agreement, and maintains he was thereby denied a fair sentencing hearing. Consequently, Torres believes the district court should have ordered specific performance of the plea agreement.

The Government stresses that its obligation to recommend a downward departure was qualified by the agreement being "based on the information at this time and based on the defendant's conduct at this time." Record at 246. In other words, the Government maintains it was not obliged to make the recommendation since subsequent to the plea agreement Torres untruthfully minimized his involvement in the offense conduct and had not fully accepted responsibility.

The district court agreed with the Government, stating that "based on the wording of the plea agreement, I don't think the Government under these circumstances is bound to recommend it." Sentencing Hearing, Kenneth Torres, Feb. 20, 1992, at 138. Nevertheless, the court did require the Government to inform the court of Torres's cooperation and the Government complied.

Our standard of review for plea agreements was stated in *United States v. Fields*, 766 F.2d 1161 (7th Cir.1985), where we said that "the interpretation of disputed terms in a plea agreement should be determined by the district court to which the plea was originally submitted based on 'objective standards,' and that where the district court has made such a determination, it should be set aside only if clearly erroneous." *Id.* at 1168 (citation omitted).

Based on our review of the record, we do not find the district court's determination of the plea agreement to be clearly erroneous. Judge Mihm justifiably said at Torres's sentencing, "I can tell you that if the Government had stood up and made a recommendation to depart downward, I would have ignored it under the record as I understand it." Sentencing Hearing, Kenneth Torres, Feb. 20, 1992, at 166. We affirm Torres's sentence.

### B. YANEZ

Yanez alleges these four errors in his sentence for conspiracy and attempt: 1) the district court miscalculated the amount of drugs attributable to Yanez; 2) the court mistakenly believed Yanez possessed a weapon in the commission of the conspiracy; 3) the court falsely characterized his role in the conspiracy; and 4) the court wrongly found Defendant obstructed justice. Before addressing these allegations, we note our standard of review.

### 1. STANDARD OF REVIEW

As was the case with Torres, each of Yanez's four arguments concern the district court's factual findings. *See, e.g., United States v. Atkinson*, 979 F.2d 1219, 1222 (7th Cir.1992) ("Determination of the quantity of drugs for sentencing purposes is a factual inquiry"); *United States v. Caicedo*, 937 F.2d 1227, 1233 (7th Cir.1991) ("determination that a defendant obstructed justice is a finding of fact"); *United States v. Atterson*, 926 F.2d 649, 661 (7th Cir.) ("the question of [defendant's] role in the conspiracy was a question of fact for the district court to determine"), *cert. denied,* —— U.S. ——, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991). That being the case, the "court's findings of fact will not be disturbed unless clearly erroneous." *United States v. Franco*, 909 F.2d 1042, 1045 (7th Cir.1990); *see also* 18 U.S.C. § 3742(e) (mandating standard of review).

### 2. AMOUNT OF DRUGS

To determine Yanez's Base Offense Level under the Guidelines, the district court needed to calculate the amount of drugs attributable to Defendant. U.S.S.G. § 2D1.4. This the court did through evidence offered at two days of sentencing hearings. These hearings featured the testimony of twelve witnesses and produced a written transcript of more than 500 pages. Through this extensive process, the court determined that 48 ounces of heroin, 59 kilograms of cocaine, and 9,856 pounds of marijuana were attributable to Yanez's conspiracy. Using the Guideline's conversion charts, these drugs are the equivalent of a total of approximately 17,631 kilograms of marijuana. Pursuant to section 2D1.1(c), this places Yanez's Base Offense Level at 36.

Yanez, however, claims the evidence, properly evaluated, only attributes 35 ounces of heroin, 33.22 kilograms of cocaine, and 1,158 pounds of marijuana to him. Ac-

cording to the Guidelines, this roughly equals 8,091 kilograms of marijuana which would result in a Base Offense Level of 34.

As we said in *United States v. Villasenor*, 977 F.2d 331 (7th Cir.1992), "Factual matters pertinent to the application of the Guidelines must be proved to the sentencing court by a preponderance of the evidence." *Id.* at 336. The question then becomes whether the Government established, by a preponderance of the evidence, that the 48 ounces of heroin, 59 kilograms of cocaine, and 9,856 pounds of marijuana were attributable to the conspiracy. According to the district judge, the answer is that the Government's witnesses actually established more than these amounts.

Eugene Baker, Ira Cauthen, and Roy Payne testified to Yanez's heroin distribution. Based on their testimony, the Government contended Yanez was responsible for the distribution of 75 ounces of heroin. The court agreed this contention was supported by a preponderance of the evidence, but "in an abundance of caution" reduced the figure to 48 ounces. Sentencing Hearing, Jose Yanez, Feb. 18, 1992, at 245.

Similarly, several witnesses, including Hector Gonzalez, Allyn Zvonik, and Paul Garcia, testified that Yanez was responsible for approximately 97 kilograms of cocaine. The court reduced that number by 36 kilograms, recognizing that in one instance there was a plausible dispute as to whether pounds or kilograms had been the proper measure. *Id.* at 247. In sum, the court found Yanez responsible for 59 kilograms of cocaine. The court, however, refused Defendant's request to further reduce that amount by 15 kilograms.

That amount was attributed to Yanez based on Yanez's own tape-recorded statement to a confidential source. In that conversation, Yanez asked if the source needed cocaine and stated that he only had one kilogram left but would soon be receiving 15 kilograms from Chicago. At sentencing, and before this court, Yanez characterized his statement as "puffery." The district court rejected this assertion based on the context of the statement and testimony as to Yanez's cocaine network. In so doing, Judge Mihm noted Yanez's extensive contacts nationwide and said, "I think the Government has established by a preponderance of the evidence that this was not puffing." *Id.* at 248.

Regarding the marijuana, the court found Yanez to be liable for 9,856 pounds. This total encompassed 800 pounds attributed to Yanez by Raymond Gamache, who had been paid to store marijuana at Gamache's home. Although Gamache testified only to the number and shape of the marijuana packages, Trooper Barry Domingos estimated the weight of those packages to be between 1,000 pounds and 1,300 pounds. His estimate was based on his four-and-a-half years experience as a narcotics investigator with the Massachusetts State Police. *Id.* at 195. "Out of an abundance of caution," the court attributed 800 pounds of that amount to Yanez. *Id.* at 249.

Defendant characterizes this assessment of the marijuana's weight as "nothing more than a blind guess." Appellant's Brief at 27. In a similar situation, though, we approved of attributing a quantity of drugs to a defendant based on an experienced narcotics officer's estimate of the drug's weight. *United States v. Buggs*, 904 F.2d 1070, 1080 (7th Cir.1990). In that case, as this, "the court was entitled to consider the officer's background and conclude that his testimony was sufficiently reliable and probably accurate." *Id.*

In addition to Raymond Gamache and Trooper Barry Domingos, the court heard testimony regarding Yanez's marijuana distribution from Allyn Zvonik, Paul Garcia, FBI Agent Gerald Karns, and Roy Payne. Payne's testimony alone attributed 7,200 pounds of marijuana to Yanez. The court reduced this amount to 5,000, again "out of an abundance of caution." Sentencing Hearing, Jose Yanez, Feb. 18, 1992, at 250.

Referring to the final figures attributed to Yanez, the judge said, "I might add for the record, for whatever it's worth, if anything, with the Court of Appeals, I believe these figures are extremely conservative." *Id.* at 252. If the witnesses at the sentencing hearings are to be believed, Yanez's

conspiracy did handle very large quantities of drugs and the amounts ultimately attributed to Yanez are indeed conservative.

■ Yanez's lengthy argument boils down to the simple premise that we should not believe these witnesses. Again, it is the district judge who evaluates the credibility of witnesses. He or she is in a unique position to do so and we will not disturb his or her determination unless it is without foundation. *United States v. Osborne*, 931 F.2d 1139, 1154 (7th Cir.1991). As indicated earlier, there were a dozen witnesses in Yanez's sentencing hearings. Each was available for cross-examination by the defense and questioning by the judge, and both parties took advantage of these opportunities. It is clear that Judge Mihm's determinations find ample support in the extensive record. We therefore reject Yanez's contentions that the amounts of drugs attributable to him were miscalculated.

### 3. POSSESSION OF WEAPON

■ After determining Defendant's Base Offense Level, the district court must look to see if any of the "Specific Offense Characteristics" of that crime were present. U.S.S.G. § 1B1.1(b). Defendant was sentenced for his conspiracy to distribute a controlled substance and attempting to possess with intent to distribute a controlled substance pursuant to U.S.S.G. sections 2D1.4 and 2D1.1.

Under section 2D1.1(b)(1), a Specific Offense Characteristic of Yanez's admitted crime is possession of "a dangerous weapon (including a firearm)." Possession leads to a two-level increase in a defendant's Base Offense. In Yanez's case, the court found he had possessed a weapon during the conspiracy.

This finding was based in part on the testimony of Allyn Zvonik. According to Zvonik, he went with Charles Hastings to meet Yanez at the house of a co-conspirator. The purpose of the encounter was for Zvonik to pick up marijuana. While sitting at the table, Yanez "pulled an automatic weapon out of a suitcase and stuck it to the back of my head and said, 'This is what we

do to people that talk,' and then he put the gun back away." Sentencing Hearing, Jose Yanez, Dec. 13, 1991, at 23. Zvonik described Yanez's weapon as a "black automatic Uzi weapon with a cylinder on it." *Id.* at 24. Charles Hastings also testified at the Sentencing Hearing that he saw Yanez possess what appeared to be an Uzi. *Id.* at 91.

Defendant maintains this testimony is insufficient to support a two-level increase in his Base Offense. However, "Section 2D1.1(b)(1) does not require that the government show a connection between the weapon and the offense, only that the weapon was possessed during the offense." *United States v. Atterson*, 926 F.2d 649, 663 (7th Cir.1991). The district court found that Zvonik's and Hastings's testimony met this standard, and increased Yanez's conspiracy and attempt sentence from 36 to 38. We affirm the district court's action.

### 4. ROLE IN THE OFFENSE

■ A defendant's Offense Level is adjusted, under the Guidelines, according to the role he or she played in the commission of that offense. U.S.S.G. § 1B1.1(c). Under section 3B1.1(a), a defendant's Offense Level is increased by four levels if the defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Per section 3C1.1, "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."

A defendant who is a leader of a conspiracy, and who lies about the facts of that conspiracy, is entitled under these two sections to a six level increase in his Offense Level. The district court found that Yanez was such a defendant, and increased his sentence for conspiracy and attempt from 38 to 44. Defendant argues this was error. Regarding his role within the conspiracy, Yanez argues he was not an "organizer or leader," but rather a "manager or supervisor." If the court had accepted his characterization, Yanez's sentence would have

been increased under section 3B1.1(b) by three levels rather than four.

In determining what role a defendant played, the district court draws inferences " 'from a variety of data, including the information in the presentence report and the defendant's statements and demeanor at the sentencing hearing.' " *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989) (citation omitted). From the voluminous record, the judge found that Yanez directed more than a dozen people in this conspiracy and utilized considerable assets in several states. Contrary to Defendant's assertion, the district court was not equivocal in its characterization of his role. Indeed, the court stated that "[h]e was an organizer, he was a leader, he was definitely a kingpin in this operation." Sentencing Hearing, Jose Yanez, Feb. 18, 1992, at 271. We cannot say the district court erred by this conclusion.

Finally, we must address Yanez's contention that he did not obstruct justice. In making this determination, "All that the district court must do is make a specific, independent finding that a defendant was less than truthful when he testified." *United States v. Easley*, 977 F.2d 283, 286 (7th Cir.1992). The court found that Yanez was less than truthful at every step of the proceedings. In his three proffers, at his Change of Plea Hearing, and during the Sentencing Hearings, Yanez provided incorrect and false information as to the amount of drugs distributed by the conspiracy and his leadership role within it. As Judge Mihm said, "I think the record is replete with evidence that would indicate he was not truthful." Sentencing Hearing, Jose Yanez, Feb. 18, 1992, at 271. We agree, and therefore affirm the court's finding.

## IV. CONCLUSION

Judge Mihm carefully considered the issues and correctly resolved them. We affirm the sentences of Kenneth Torres and Jose Luis Yanez.

AFFIRMED.