16 F.3d 1226
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
German GONZALEZ, Defendant-Appellant.
 No. 93-1599.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 15, 1993.
Decided Feb. 17, 1994.
Rehearing and Suggestion for Rehearing En Banc Denied Oct. 31, 1994.
 
 Before CUDAHY, FLAUM and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 German Gonzalez seeks the reversal of his convictions for conspiracy to possess with the intent to distribute in excess of 500 grams of cocaine, 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2, and for possession with the intent to distribute cocaine. 21 U.S.C. Sec. 841(a)(1). He contends that the evidence against him was insufficient to support the convictions because the testimony of three prosecution witnesses was incredible on its face. After reviewing the evidence in the light most favorable to the government, we affirm because a jury reasonably could have concluded that Gonzalez was guilty beyond a reasonable doubt on all counts.
 
 
 2
 I. Background.
 
 
 3
 In May 1992, a Drug Enforcement Administration (DEA) Task Force began investigating a drug operation in Milwaukee, Wisconsin. From May 21, 1992, to August 21, 1992, DEA Agent Sloey made several purchases of cocaine from an individual by the name of Herminio Ortiz. On one occasion, Agent Sloey paid for the cocaine with marked money. Although the defendant, German Gonzalez, was not present during any of the transactions, DEA surveillance observed Ortiz enter Gonzalez's apartment prior to the sale on two occasions, and on one of those occasions, Ortiz was observed exiting the apartment with a bag he had not taken into the apartment. Thus, the DEA concluded that Gonzalez was supplying the cocaine Ortiz was selling. Meanwhile, DEA Agent Carr, after receiving a sample of cocaine from a suspect named Carmen Fontanez, negotiated a purchase of 10 kilos of cocaine. Fontanez's phone was wiretapped, and in a taped telephone conversation between a man who called himself "Cookie" and Fontanez, the two discussed his attempts to supply her with ten kilos of cocaine for re-sale.
 
 
 4
 This investigation resulted in the arrest of Gonzalez, Ortiz and Fernandez in August 1992. Gonzalez was charged with one count of conspiracy to possess with intent to distribute cocaine between May 21, 1992, and August 21, 1992, and six counts of possession with intent to distribute cocaine, each relating to different dates within the relevant time period. Three witnesses testified that Gonzalez had supplied them with cocaine for re-sale during this period: Ortiz, Simon Hernandez-Almazon (Hernandez), and Fontanez. Ortiz testified that the cocaine he sold to Agent Sloey was obtained from Gonzalez, and that on one occasion he and Gonzalez had delivered one-fourth kilo of cocaine to Hernandez. Hernandez testified that on June 17, 1992, Gonzalez and Ortiz delivered one-fourth kilo of cocaine to him. Carmen Fontanez testified that Gonzalez had met with her in a tavern where he offered to supply her with cocaine. Gonzalez had first provided her with a sample ounce of cocaine which she had passed on to DEA Agent Carr. Gonzalez gave Fontanez his phone number and said he lived on West Wisconsin Avenue. He then agreed to obtain 10 kilos of cocaine for her to sell to her customer, Agent Carr.
 
 
 5
 When Gonzalez was arrested he was carrying a beeper, the number of which Ortiz testified to from memory, and a business card from the tavern in which Fontanez said she had met Gonzalez. A search of his residence produced $1,200 of the marked money, inositol (a substance used to cut cocaine), drug packaging, a beeper with a Florida number, a phone bill for a 2929 West Wisconsin address, drug ledgers and a paper which noted the names of several law enforcement and judicial officers.
 
 
 6
 Gonzalez was convicted on all seven counts. He was sentenced to a total of 96 months imprisonment followed by five years of supervised release and fined $5,000.
 
 
 7
 II. Standard of Review.
 
 
 8
 The government must prove each count of a multiple count indictment beyond a reasonable doubt. In re Winship, 397 U.S. 358 (1969). A court reviewing a conviction under a challenge to the sufficiency of the evidence must consider all the evidence and all reasonable inferences that can be drawn from the evidence in the light most favorable to the government. United States v. Jairo Soto-Rodriquez, 7 F.3d 96, 99 (7th Cir.1993). If "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Jackson v. Virginia, 443 U.S. 307, 319 (1979), the court must affirm the verdict. Where the trier of fact is a jury, the court must "defer to reasonable inferences drawn by the jury and the weight it gave to the evidence." United States v. Beverly, 913 F.2d 337, 360 (7th Cir.1990), cert. denied, 498 U.S. 1052 (1991).
 
 
 9
 III. Discussion.
 
 
 10
 Several of Gonzalez's convictions rested almost entirely on the uncorroborated testimony of Ortiz, Hernandez, and Fernandez that on different occasions Gonzalez supplied or agreed to supply them with cocaine. Because Gonzalez's challenge to these witnesses' reliability is central to his claim that the evidence was insufficient to support his convictions, it is considered first. Determinations as to the credibility of witnesses are within the province of the jury and are not reviewed by the court. United States v. DePriest, 6 F.3d 1201, 1206 (7th Cir.1993); United States v. Maholias, 985 F.2d 869, 874 (7th Cir.1993). Even when a conviction rests upon the uncorroborated testimony of an accomplice, the verdict will be upheld unless the testimony is incredible as a matter of law. United States v. Dunnigan, 884 F.2d 1010, 1013 (7th Cir.1989). To be legally incredible, the testimony must be incredible on its face, or rather, "impossible under the laws of nature for the occurrence to have taken place at all." Id.
 
 
 11
 In an attempt to establish Ortiz's lack of credibility, Gonzalez submits that Ortiz's sworn testimony--that Ortiz was not present when Jose obtained cocaine from Gonzalez on May 21, 1992--was inconsistent with his testimony that he saw Gonzalez in a gold Cadillac at the time. We note, however, that "[m]ere inconsistencies in the witness' testimony do not render it legally incredible." United States v. Villasenor, 977 F.2d 331, 335 (7th Cir.1992) (quoting Dunnigan, 884 F.2d at 1013), cert. denied, 113 S.Ct. 1340 (1993). Moreover, Ortiz did not say that he was nowhere near Gonzalez when the cocaine changed hands between Gonzalez and Jose, he merely stated that he was not in the immediate vicinity. Therefore, Gonzalez cannot rely on this inconsistency to demonstrate Ortiz's overall lack of credibility.
 
 
 12
 Gonzalez also contends that Ortiz's testimony was unreliable because he had a history of psychological problems. Gonzalez offers as an example that Ortiz testified that he did not speak to Agent Sloey on November 8, 1992, the day before the trial. However, Agent Sloey testified that he did meet with Ortiz that day. Questions as to the mental capacity of a witness to observe, remember, and relate information go to the competency of a witness to testify and are determined by the trial court. Fed.R.Evid. 104(a). Ordinarily, a litigant who fails to object to the competency of a witness before the witness testifies, or to move to strike his testimony on that basis, waives the right to do so. United States v. Odom, 736 F.2d 104, 112 (4th Cir.1984). Consequently, a challenge to a witness's reliability can only be brought in the form of an attack on his credibility, which is a question left to the jury. United States v. Lindstrom, 698 F.2d 1154, 1161 n. 4 (1983). Here, the jury was made aware of Ortiz's history of mental or emotional problems and had an opportunity to weigh its effect on his credibility. The jury also had an opportunity to consider Ortiz's poor memory. Nothing in Ortiz's testimony suggests that he was so incoherent or unreliable that this court should disregard the jury's determination that he was believable.
 
 
 13
 Gonzalez finally attempts to establish Ortiz's lack of credibility by pointing out that he testified pursuant to a plea agreement. It has been repeatedly stated that "[o]nly if the testimony is 'inherently unbelievable' will this court overturn a guilty verdict based on the testimony of a co-conspirator testifying pursuant to a plea agreement.' " DePriest, 6 F.3d at 1208. Gonzalez has not directed this court's attention to any inherently unbelievable statements made by Ortiz. The fact that he told the police one story about the purpose of money he had given to Gonzalez, but told a different story at trial, does not make his testimony at trial inherently unbelievable. When confronted with the inconsistency, Ortiz explained that Gonzalez had told him what to say about the money's purpose and that originally he did not want to get Gonzalez in trouble. Although Ortiz had made other incriminating statements about Gonzalez to the police, his explanation was reasonable.
 
 
 14
 Gonzalez also challenges the credibility of Hernandez. Hernandez pled guilty to drug charges, agreeing to testify against Gonzalez in order to obtain a more lenient sentence. His testimony was relevant only to one count (count 4) of possession with intent to distribute. Gonzalez contends that Hernandez's statement--that Hernandez was not sure he recognized the judge beside him as the man who accepted his guilty plea--demonstrates Hernandez's unreliability. However, we cannot agree that Hernandez's failure to recognize a judge who accepted a guilty plea from across the room is, by itself, proof of his inability to remember any face-to-face transaction. Hernandez's credibility was challenged before the jury when he acknowledged that he could not identify Gonzalez with 100% certainty. The jury nonetheless found Hernandez's testimony credible enough. This is not unreasonable.
 
 
 15
 Fontanez, was also an unreliable witness, according to Gonzalez. In exchange for pleading guilty and for testifying, the government dropped five of seven charges against Fontanez. However, Fontanez explicitly stated that she had already been sentenced prior to testifying against Gonzalez. She said, "I will get nothing for this. What I have coming I got it when I first pleaded guilty." Tr. 87. The jury knew that she was told before she pleaded that, in sentencing her, the judge would consider the fact that she had told the truth. This does not mean necessarily, as Gonzalez implies, that she believed what she said at his trial would effect her sentence. Based on these charges, there is no reason to override the jury's determination that she was credible. Since Gonzalez does not otherwise explain why Fontanez's testimony is inherently unbelievable, her testimony is sufficiently reliable.
 
 
 16
 A. Possession with Intent to Distribute.
 
 
 17
 In order to prove possession with intent to distribute cocaine, the government must prove beyond a reasonable doubt that the defendant: (1) knowingly or intelligently possessed cocaine, (2) had the intent to distribute it, and (3) knew the cocaine was a controlled substance. United States v. Boykins, 9 F.3d 1278 (7th Cir.1993); United States v. Reed, 2 F.3d 1441, 1445 (7th Cir.1993), petition for cert. filed, --- U.S.L.W. ---- (U.S. Dec. 7, 1993). Gonzalez contends that the uncorroborated testimony against him was insufficient to support his convictions for possession with intent to distribute cocaine. While the testimony was often uncorroborated, Gonzalez failed to establish that the witnesses were incredible as a matter of law. Therefore, the jury could rely only on their testimony in finding that the government had established his guilt beyond a reasonable doubt. United States v. Byerley, 999 F.2d 231, 235 (7th Cir.1993) ("It is well established that jurors may rely on the uncorroborated testimony of a co-conspirator.").
 
 
 18
 We conclude that the conviction for the January 15, 1992, possession with intent to distribute, count 2, was supported by sufficient evidence. Fontanez testified that she met Gonzalez in a tavern in December 1991, and that Gonzalez gave her a sample ounce of cocaine in the hope that she might buy some from him later. Gonzalez also gave her his phone number and told her that he lived at 2929 West Wisconsin Avenue. Fontanez stated that she gave the cocaine to undercover Agent Carr for a similar purpose. Agent Carr testified that he received a sample of cocaine from Fontanez on or about that January 15, 1992. A taped telephone conversation, made pursuant to an investigation of Fontanez, was introduced during her testimony. The conversation was between a man who identified himself as "Cookie" and Fontanez and concerned his attempts to supply her with ten kilos of cocaine. Fontanez testified that "Cookie" was Gonzalez. Ortiz and Hernandez also stated that they knew Gonzalez as "Cookie". When Gonzalez was arrested, receipts bearing the name "Cookie" were found in his residence, and he was carrying a business card from the tavern where Fontanez claimed she met him.
 
 
 19
 The testimony of Ortiz and Agent Sloey was sufficient to support Gonzalez's conviction under count 3. Ortiz testified that the first time he saw Gonzalez was after he had asked Jose for cocaine--Jose called someone who was to come by with the cocaine and then Ortiz saw Gonzalez drive up in a Gold Cadillac. Ortiz did not see any cocaine change hands between Gonzalez and Jose but, when he later obtained the cocaine from Jose in the men's room of the hotel, Jose told Ortiz that the source of the cocaine was Gonzalez. After all this, Ortiz sold the same cocaine to Agent Sloey at the same location and on the same date. Agent Sloey corroborated this transaction when he testified that he purchased one ounce of cocaine from Ortiz in the Pfister Hotel on May 21, 1992.
 
 
 20
 The conviction for count 4 was sufficiently supported by the testimony of both Ortiz and Hernandez. Each testified that Gonzalez and Ortiz delivered one-half kilo of cocaine to Hernandez on June 17, 1992. Ortiz testified that he arranged for Gonzalez to sell the cocaine to Hernandez, and that as part of his compensation for arranging the transaction, Hernandez forgave some of Ortiz's debt.
 
 
 21
 The evidence was also sufficient to support the conviction on count 5. Agent Sloey testified that he purchased one ounce of cocaine from Ortiz on August 13, 1992. Ortiz testified that after Hernandez's arrest, Ortiz's source of cocaine became Gonzalez. As Hernandez had already been arrested on August 13, 1992, the jury reasonably could have concluded that Ortiz had obtained the cocaine he sold to Agent Sloey on that date from Gonzalez.
 
 
 22
 The conviction for count 6 was also supported by sufficient evidence. Agent Sloey testified that on August 18, 1992, he purchased two ounces of cocaine from Ortiz. Agent Allen testified that prior to the transaction, through surveillance, he observed Ortiz enter Gonzalez's residence at 3037 North Maryland with nothing and exit with a bag in his hand. Agent Sloey paid Ortiz for the cocaine with marked money, some of which was found in Gonzalez's residence three days later. Gonzalez attempted to establish the possibility that Ortiz went to his partner Carlos's house where Carlos supplied him with the cocaine. However, Ortiz testified that Carlos's sole function was to cut the cocaine.
 
 
 23
 The evidence supporting the conviction on count 7 included the testimony of Agent Sloey, Ortiz, and several agents who were surveilling Gonzalez and Ortiz on August 21, 1992. Agent Sloey testified that he negotiated a transaction involving one-fourth kilo of cocaine with Ortiz on that day. Agent Boobar testified that prior to the exchange, he observed Ortiz enter Gonzalez's residence at North Maryland, and exit twenty minutes later, apparently empty handed. After leaving Gonzalez's, Ortiz was observed going to Carlos's house. Again, Gonzalez suggests that Ortiz obtained cocaine from Carlos rather than Gonzalez. However, Ortiz testified that he got the cocaine from Gonzalez and took it to Carlos's to be cut.
 
 
 24
 B. Conspiracy to Possess with Intent to Distribute.
 
 
 25
 In order to establish a conspiracy, the government must prove: (1) the existence of an agreement, and (2) the defendant's intent to join the agreement. United States v. Durrive, 902 F.2d 1221, 1225 (7th Cir.1990); United States v. Lechuga, 994 F.2d 346, 348-49 (7th Cir.1993), cert. denied, 114 S.Ct. 482 (1993). A conspiracy can be inferred from circumstantial evidence. United States v. Pedigo, No. 91-3636, slip op. at 7 (7th Cir. Dec. 1, 1993); Durrive, 902 F.2d at 1225. However, when the government seeks to prove the existence of a conspiracy by inference, it bears a heavy burden. Pedigo, slip op. at 8. In the context of drug distributions, the government must prove more than mere association, it must prove the defendant was part of an agreement with other people to carry out a common objective. Id. at 8 ( citing United States v. Sababu, 891 F.2d 1308, 1322 (7th Cir.1989)).
 
 
 26
 Gonzalez claims that the evidence is insufficient to support a conviction for conspiracy because the witnesses were incredible. That argument has already been refuted. He also claims that the government did not establish that he was involved in anything more than several buyer-seller relationships. Gonzalez asserts that his were arms-length relationships inconsistent with the theory of conspiracy. He also argues that he could not have entered a conspiracy because he did not know to whom the cocaine would be distributed, even if he did know that it would be resold.
 
 
 27
 While mere knowledge of someone's intent to commit an illegal activity, and even facilitation of their ability to commit it, is insufficient to establish intent to join a conspiracy, Pedigo, slip op at 8, evidence of prolonged cooperation "is one type of evidence of an agreement that goes beyond what is implicit in any consensual undertaking, such as a spot sale." Lechuga, 994 F.2d at 350; United States v. Koenig, 856 F.2d 843, 854 (7th Cir.1988) ("An ongoing relationship involving the distribution of drugs is evidence of a concert of action."). Here, the conclusion that Gonzalez and Ortiz had an ongoing relationship is supported by the fact that Gonzalez supplied or agreed to supply Ortiz with cocaine on more than 10 or 15 occasions. Furthermore, Gonzalez provided Ortiz with cocaine on a "front", or credit basis, "which may support an inference that he became a co-venturer by a profit-sharing arrangement." United States v. Baker, 905 F.2d 1100 (7th Cir.1990), cert. denied, 498 U.S. 876 (1990).
 
 
 28
 The conclusion that Gonzalez conspired to distribute cocaine is further supported by the fact that Ortiz arranged a sale between Gonzalez and Hernandez and also by the fact that a woman named Lisa often provided the cocaine Gonzalez sold to Ortiz. This evidence suggests that Ortiz and Lisa functioned as go-betweens, facilitators, sales agents, or general helpers, further evidence of a conspiracy. Lechuga, 994 F.2d at 350. The fact that Gonzalez may not have been able to provide enough cocaine for major deals in a short time does not negate the evidence that he agreed to provide as much as he could. Neither does the fact that Ortiz may have had more than one source of cocaine.
 
 
 29
 IV. Conclusion.
 
 
 30
 Because the evidence was sufficient for the jury to conclude that Gonzalez was guilty of conspiracy to possess and possession with intent to distribute cocaine, the judgment of the district court is AFFIRMED.